**Kunwar S.P. SINGH, Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC., and Benjamin W. White, Defendants.**

**No. 99–CV–11183–MEL.**

United States District Court, D. Massachusetts.

Oct. 4, 2001.

William Curry, Somerville, MA, for Kunwar S.P. Singh, M.D., plaintiff.

Nicholas J. Nesgos, Posternak, Blankstein & Lund, LLP., Boston, MA, for Blue Cross and Blue Shield of Mass, Inc., defendant.

## MEMORANDUM AND ORDER

LASKER, District Judge.

Dr. Kunwar S.P. Singh brings this suit against Blue Cross and Blue Shield of Massachusetts ("Blue Cross") and an independent consultant, Dr. Benjamin W. White, to redress alleged injuries stemming from a Blue Cross peer review process that made critical assessments of Singh's competence. He sues Blue Cross for defamation, breach of contract, tortious interference with advantageous business relations, and for violation of M.G.L. ch. 93A. His remaining Count against White is for defamation.

The defendants move jointly for summary judgment, contending that they are immune from suit for money damages and that, even if they are not immune, no reasonable factfinder could find them liable under the various Counts alleged. The motion is granted and the complaint is dismissed.

### I.

Singh practices internal medicine in Malden, Massachusetts. Prior to 1992, he provided care to members of at least two insurance companies: Bay State Health Care, Inc., and Blue Cross. In 1992, Bay State Health Care, Inc., merged with Blue Cross. After the merger, Blue Cross created a new Blue Cross product called the "Bay State product line."

Blue Cross chose not to allow Singh to enter the new Blue Cross Bay State product line due to concerns about his past practice patterns. Singh challenged this determination and, after drawn out discussions, entered into an agreement with Blue Cross in October, 1994 (the "Audit Agreement"), that specified the procedures by which Blue Cross would conduct an audit of Singh's practice to determine whether to admit him to the Bay State product line.

One of the procedures involved the choice of a "mutually agreeable peer review consultant." Aff. of Nicholas J. Nesgos, Ex. F (Audit Agreement). Blue Cross proposed certain doctors by memorandum on February 24, 1995. Singh did not respond until March 29, 1995. Thereafter, Blue Cross agreed to Singh's proposed reviewer, Dr. Alan Criss, but Criss decided against performing the review. In November of that year, Blue Cross, after several attempts to get Singh to agree to another reviewer, unilaterally chose Dr. Walter Clayton to perform the review.

In the midst of this process, by letter dated June 13, 1995, Blue Cross notified Singh that he would be terminated as a Blue Cross provider. Blue Cross has admitted that this letter was sent in error.

Clayton's review (the "first audit") was based on a random sample of 25 of Singh's patient files. It criticized Singh's practices, concluding that Singh was "somewhat below recognized standard of care." Aff. of Nesgos, Ex. O (Peer Review Consultant Form: Summary Page). However, Clayton also stated that Singh "should be commended" for his handling of patients coming from low socioeconomic backgrounds. Aff. of Nesgos, Ex. K (Medical Record Review).

As a result of this first audit, Blue Cross, through its Remedial Action Committee ("RAC"), decided not to allow Singh to enter the new Bay State product line, and notified his old Bay State patients of this decision. Moreover, the first audit sparked a second audit, by a physician of Blue Cross's own choosing, defendant White, to determine whether to keep Singh as a provider in Blue Cross's exist-

ing insurance plans. The RAC also voted to freeze Singh's HMO Blue Patient Panel "effective immediately," which meant that Singh could continue to treat his current HMO Blue patients, but could not accept new patients under that plan. For "administrative reasons," Blue Cross did not follow through on this RAC vote to "freeze" Singh's patient panel, as throughout this time period Singh continued to accept new Blue Cross patients and bill Blue Cross for services rendered.

White's review (the "second audit") was based not on a random sample of Singh's patient files, but instead on a focused group of files concentrating on patients to whom Singh had prescribed narcotics. Thirty-seven files were reviewed in total: 21 patients who had been prescribed controlled substances and 16 other randomly selected patients. Blue Cross explains this selection was based on the concern raised by the first audit that Singh was improperly prescribing narcotics. White did not know that the patient files were focused and nonrandom.

The second audit was significantly more critical of Singh's practice than the first audit, and is the basis of Singh's defamation claims. White criticized Singh's decision-making in many areas, including the prescription of narcotics and his treatment of patients with chronic back and neck pain, emotional disorders, and asthma. White concluded: "Competent care is rarely seen." Aff. of Nesgos, Ex. X (White Audit Report).

After the second audit revealed these serious problems in Singh's conduct, the RAC voted to discontinue Singh's inclusion in all Blue Cross product lines. This decision by the RAC entitled Singh to a "fair hearing" before two independent doctors and a lawyer, assembled and retained by Blue Cross.

The "fair hearing" panel conducted five days of hearings, at which both Blue Cross and Singh were represented by counsel. The panel ultimately decided that although there were concerns about Singh's practice, terminating his relationship with Blue Cross was not an appropriate remedy. The entire peer review process was confidential.

When Singh commenced this suit on April 1, 1999, he remained a provider for several Blue Cross product lines, just as he had been in 1992. The Bay State product line that Blue Cross introduced to handle new members from Bay State Health Care, Inc., when that company merged into Blue Cross was discontinued, and therefore neither Singh nor any other physician could be a provider for it. Singh's claims are therefore based on alleged injuries he suffered during the peer review process.

## II. Immunity

The defendants contend that under the provisions of two separate statutes they are immune from suit for money damages: (1) the Healthcare Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101–52 (1994); and (2) the Massachusetts state peer review statute, M.G.L. ch. 111, § 203(c) (2000). This issue is a question of law: "Under no circumstances should the ultimate question of whether the defendant is immune from monetary liability under HCQIA be submitted to the jury." *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir. 1994), *cert. denied*, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995).

### A. HCQIA, 42 U.S.C. §§ 11101–52 (1994)

The defendants assert that the provisions of the HCQIA grant them immunity from liability. The HCQIA grants immunity in situations of medical peer reviews, but only under certain enumerated conditions. *See* 42 U.S.C. § 11112(a). Whether

these conditions are met is disputed by the parties.

1. *Acts that Constitute "Professional Review Actions"*

Immunity attaches to individuals and entities only for "professional review actions" that meet the enumerated conditions in the HCQIA's section 11112(a). A professional review action is defined in the HCQIA as:

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9). The HCQIA also recognizes a separate concept, termed a "professional review activity," which is defined as:

an activity of a health care entity with respect to an individual physician—
(A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
(B) to determine the scope or conditions of such privileges or membership, or
(C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10).

Under these two definitions, Singh contends that Blue Cross took no less than eight separate "professional review actions" that should be subjected to scrutiny: (1) Blue Cross's decision not to "recon-tract" with Dr. Singh in 1992 after the Bay State Health Care, Inc., merger; (2) entering the 1994 Audit Agreement signed between Singh and Blue Cross acknowledging that Blue Cross would be auditing Singh; (3) the RAC decision not to admit Singh to the Bay State product line; (4) the RAC decision to conduct a second audit; (5) the RAC decision to freeze Singh's HMO Blue Patient Panel "effective immediately;" (6) the RAC decision to notify Singh's Bay State patients that he was no longer a Bay State provider; (7) sending the letter dated June 13, 1995, notifying Singh that he would be terminated as a Blue Cross provider; and (8) the RAC vote to terminate his Blue Cross provider status.

Blue Cross objects to the characterization of these events as "professional review actions," and contends that only: (1) the RAC decisions to not admit Singh to the Bay State product line, (2) to freeze Singh's HMO Blue Patient Panel, and (3) to terminate Singh's status as a provider, subject to a fair hearing review, constituted "professional review actions." Blue Cross asserts that while the 1992 decision not to admit Singh to the Bay State product line was a "professional review action," Singh waived his claims with regard to it in a release of prior claims found in Article III of the Audit Agreement.

Untangling this thicket identifies four "professional review actions," only three of which are actionable in the present suit. First, the parties do not dispute that the RAC vote to terminate Singh as a Blue Cross provider was a "professional review action." Nor do the parties dispute that the 1992 decision not to admit Singh to the Bay State product line was a "professional review action." However, the language of the 1994 Audit Agreement signed by Singh and Blue Cross clearly waives any rights Singh had to bring suit with regard to this

action by Blue Cross.[1] Accordingly, there is no need to evaluate Singh's claim with regard to this Blue Cross decision.

Second, the parties agree that the Blue Cross RAC decisions not to admit Singh to the Bay State product line and to freeze Singh's HMO Blue Patient Panel are both "professional review actions." The Blue Cross letter notifying Singh's Bay State patients that he was no longer a Bay State provider after these RAC decisions constitutes part of the same decision not to contract with Singh, and should not be considered a separate "professional review action."

■■■ However, the 1994 Audit Agreement acknowledging that Blue Cross would be auditing Singh; the RAC decision to conduct a second audit by White; and Blue Cross's letter dated June 13, 1995, notifying Singh that he would be terminated as a Blue Cross provider (and later admitted to be sent in error), are not "professional review actions." Rather, these are best characterized as "professional review activities" because they constitute steps in an investigation that ultimately led to an "action." The distinction is explained by *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 634 (3d Cir.1996) (emphasis added):

> The definition of "professional review action" encompasses decisions or recommendations by peer review bodies that directly curtail a physician's clinical privileges or impose some lesser sanction that may eventually affect a physician's

privileges. *"Professional review actions" do not include a decision or recommendation to monitor the standard of care provided by a physician or fact-finding to ascertain whether a physician has provided adequate care. These are "professional review activities."*

Under this reasonable interpretation of the distinction between the two terms, the audits and letter do not constitute "professional review actions."

### 2. Conditions Necessary to Establish Immunity under the HCQIA

■■■ These three "professional review actions" must now be reviewed to determine whether they followed the conditions set out in the HCQIA that, if followed, grants immunity to the defendants. The HCQIA provides:

> a professional review action must be taken—

> (1) in the reasonable belief that the action was in the furtherance of quality health care,

> (2) after a reasonable effort to obtain the facts of the matter,

> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain

1. The Audit Agreement reads:

III. Release—In consideration of the terms contained in the Agreement, Dr. Singh releases Blue Cross and Blue Shield and its successors, assigns, officers, directors, agents and employees, from any and all claims known or unknown which he may have now or at any time in the future make against Blue Cross and Blue Shield, and its successors, assigns, officers, directors, agents and employees, and which

arise out of or relate in any way to his non-acceptance as a participating provider in the new Bay State Health Care/Blue Choice products and/or the conduct and results of the audit described in this Agreement. This Release shall not be construed to apply to any claim Dr. Singh may have regarding the conduct of the audit itself or any willful failure to comply with this Agreement.

Aff. of Nesgos, Ex. F (Audit Agreement).

facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). These conditions are evaluated under a standard that imposes the burden of proof on the plaintiff to show that they have not been met. "A professional review action shall be presumed to have met the preceding standards ... unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. § 11112(a).

### a. The RAC Decisions not to Admit Singh to the Bay State Product Line and to Freeze Singh's HMO Blue Patient Panel

Blue Cross contends that it met each of the four HCQIA standards with regard to these two "professional review actions." First, it asserts that the RAC had ample basis to believe that each decision would "further quality health care." 42 U.S.C. § 11112(a)(1). In particular, the report by Clayton, the first audit, contained numerous critical assessments of Singh's practice, including the amount of narcotics and antibiotics prescribed. Second, Blue Cross contends that Singh was not entitled to a hearing as a matter of course, as the HCQIA requires only "adequate notice and hearing procedures ... or ... such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3) (emphasis added). Blue Cross contends that its "other such procedures" included the hiring of an independent and unbiased reviewer, Clayton, to examine a random sample of 25 of Singh's patient files, and the inspection of the report by the members of the RAC. *See Perez v. Pottstown X-Ray Specialists, P.C.*, 1998 WL 464916 at *11 (E.D.Pa. August 3, 1998) (finding post-suspension hearing adequate to meet HCQIA standard in situation of immediate risk to patients). Blue Cross concludes that the adequacy of its procedures should be evaluated in light of the minor actions the

RAC decided to take. Moreover, according to Blue Cross, the decision not to allow Singh into the Bay State product line is softened by the fact that the entire product line was discontinued shortly after the first audit of Singh. Finally, although the RAC had determined to "freeze" Singh's HMO Blue patient panel, which would have prevented Singh from taking on new HMO Blue patients, Blue Cross never implemented this precautionary measure.

Singh responds that Blue Cross in fact was acting out of a desire to enhance its profit margin by reducing "over-utilization" of services, and therefore was not concerned with improving the quality of care provided to Singh's patients. He argues that Blue Cross failed to include him in any of the processes that led to these two critical "professional review actions," and that therefore it could not have reasonably gotten all of the relevant facts nor provided an adequate hearing. Singh concludes by stating that, looking at the totality of the circumstances, Blue Cross could not have reasonably believed that they were acting in a manner that was warranted by the facts.

 Blue Cross met the minimal standards of the HCQIA for these two "professional review actions." Under the objective test required for determining whether the RAC had at least the "reasonable belief" that its actions were "in the furtherance of quality health care," the subjective intent of the individuals involved is irrelevant. 42 U.S.C. § 11112(a)(1); *Mathews*, 87 F.3d at 635. Reviewing the two decisions with an eye toward the information that was available at the time they were made, Singh has failed to show by a preponderance of the evidence that Blue Cross did not act in furtherance of quality of health care. For example, in the first audit of Singh, Clayton's assessment of Singh's practice concluded that Singh's pa-

tient care exhibited, in Clayton's opinion, "excessive" prescriptions of pain medication as well as use of antibiotics for an "inappropriate amount of time." Aff. of Nesgos, Ex. K (Report of Clayton). These are medical, rather than economic, concerns that motivated the RAC. *See* Aff. of Jeffrey Kraines, ¶ 4. Blue Cross also made a reasonable effort to obtain the facts of the matter by hiring Clayton as an independent reviewer. The HCQIA entitled Singh to a reasonable investigation, not a perfect one. *Egan v. Athol Mem'l Hosp.,* 971 F.Supp. 37, 43 (D.Mass.1997), *aff'd,* 134 F.3d 361 (1st Cir.1998) (table opinion), *cert. denied,* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998).

As for the failure to provide a hearing before the "professional review actions" were taken, no hearing is required by the HCQIA. Section 11112(b), the safe harbor provision of the HCQIA, lists conditions which, if met, satisfy Section 11112(a)(3). Section 11112(b), however, also provides that a "professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section." Singh negotiated with Blue Cross the format for the first audit, formalized in the Audit Agreement, and chose not to include a formal hearing as part of the process. The Audit Agreement does provide Singh an opportunity to discuss the conclusions of the peer reviewer with the reviewer, but it is undisputed that Singh did not ask Blue Cross to set up such a meeting. Accordingly, it cannot be said that Singh has shown that the procedures were not fair under the circumstances. Finally, the record does not support Singh's contention that Blue Cross did not act "in the reasonable belief that the action was warranted by the facts." 42 U.S.C. § 11112(a)(4).

Having met the requirements of the HCQIA, Blue Cross is entitled to immunity for these two "professional review actions."

### b. The RAC Vote to Terminate Singh as a Blue Cross Provider

■ Singh's complaint centers on one "professional review action": the RAC vote to terminate him as a provider for all Blue Cross health care insurance plans. The parties quibble over what processes should be included when reviewing this "professional review action." Singh contends that the relevant processes stopped when the RAC voted to terminate him; Blue Cross includes the fair hearing review after the RAC vote.

Since it is apparent that the RAC acted in full knowledge that a fair hearing review would be afforded to Singh, it makes sense to include the fair hearing review as part of the process given Singh. In fact, perhaps the best way to characterize this "professional review action" is not as the RAC vote to terminate, but instead as the fair hearing review panel's decision to reject the RAC recommendation and to retain Singh. A decision to take no action is explicitly within the definition of a "professional review action." 42 U.S.C. § 11151(9).

Turning then to the four requirements established by Section 11112(a), the parties again dispute whether each was met by Blue Cross. Blue Cross contends that it was unequivocally acting to improve the quality of health care, and the fact that the RAC vote was later rejected by the fair hearing review panel does not undermine the fact that the RAC reasonably believed it was acting in the interests of health care. *See* 42 U.S.C. § 11112(a)(1). Second, Blue Cross contends that it has far exceeded the modest requirements of the HCQIA by directing two internal medicine specialists to audit his practice, providing five physicians to review the audits as

members of RAC, and hiring two independent physicians and an attorney to review the RAC decision as part of a fair hearing panel. Third, Blue Cross argues that it gave ample notice before acting to terminate his rights. Fourth, Blue Cross asserts that the RAC made its decision based on the facts known to it at the time the decision was made, and therefore it cannot be reasonably said to have acted otherwise.

Singh disagrees, contending Blue Cross met none of the four requirements. Singh maintains that the basis of the decision was not furthering quality health care or even medicine, but was instead to protect Blue Cross's bottom line by reducing "over-utilization." An economic motive, Singh contends, is not appropriate under the HCQIA. Further, he argues that he was not allowed to participate in the RAC determination at all, and was only told of the result when he was simultaneously informed that he could appear before a fair hearing review panel. Because he was not allowed to participate, Singh asserts that Blue Cross could not have made a reasonable investigation of the facts—it gathered only one side of the story. Given Singh's view that the "professional review action" was the RAC vote to terminate, not including the fair hearing review, he asserts that he was not given a hearing until *after* the "professional review action" was taken, while the HCQIA requires such a hearing *before* the "professional review action." Finally, Singh asserts that Blue Cross could not have reasonably believed that it was acting based on the facts because Blue Cross knew it had submitted a nonrandom sample of patient files to White (focusing on patients Singh had prescribed narcotics). This skewed sample, according to Singh, made it impossible for the RAC to be acting on all of the relevant facts.

Singh has not shown that the Blue Cross peer review process did not meet the HCQIA standards. As to the issue of whether Blue Cross was acting to further the quality of health care, it is clear that the RAC believed that it was acting to protect patients. While concerns about "over-utilization" have an economic component, they also have a direct connection to patient care. Too much testing or medicine is not in the best interests of a patient's health. Moreover, there is significant evidence that indicates that the RAC was acting for reasons other than "over-utilization." For example, White's report concludes that in the area of narcotics, "Singh appeared to be practicing questionable medicine, with inadequate documentation, and questionable office practices." Aff. of Nesgos, Ex. X (White Audit Report). But White's negative evaluation was not limited to patients who had been prescribed narcotics. White also questioned Singh's care of patients with chronic back and neck pain ("significantly 'substandard' "), patients with emotional disorders ("failed to meet the minimal standards of the medical community"), and asthma patients ("failed to deliver quality care"). Aff. of Nesgos, Ex. X (White Audit Report). White concluded that "[t]here is a general pattern of inadequate or delayed evaluation and treatment, and failure to refer. Competent care is rarely seen." Aff. of Nesgos, Ex. X (White Audit Report). The preponderance of the evidence suggests that the RAC did act in the reasonable belief that it was furthering health care quality.

Moreover, the massive investigation and series of independent audits and committee reviews undercuts Singh's contention that Blue Cross did not undertake a satisfactory investigation. Again, Singh is entitled only to a reasonable review, not a perfect one. *Egan,* 971 F.Supp. at 43. As for the adequacy of notice and hearing procedures, these were more than amply met by Blue Cross. Singh was not enti-

tled to be part of the process under the HCQIA. *Egan,* 971 F.Supp. at 43.

Finally, the record is devoid of any evidence that suggests that the RAC believed it was acting in a manner that was not in accord with the facts it had uncovered. It made sense for Blue Cross to focus on patient files with narcotics prescriptions in the White Audit when the first audit by Clayton revealed a possible problem with narcotics prescriptions. A nonrandom selection does not infer that the action was unwarranted.

Blue Cross is therefore entitled to immunity from suits seeking money damages based on the RAC vote to terminate Singh's Blue Cross provider status.

Having found Blue Cross immune for all of the "professional review actions" it took, Blue Cross's motion for summary judgment is granted and the complaint against it is dismissed.

### 3. White

■ White, the doctor who performed the second audit of Singh's practice, contends he is immune from liability under two provisions of the HCQIA. First, the HCQIA provides: "[i]f a professional review action of a professional review body meets all the standards specified in section 11112(a) of this title [the four criteria discussed above] . . . any person who participates with or assists the body with respect to the action, shall not be liable in damages. . . ." 42 U.S.C. § 11111(a)(1)(D). White asserts that he was merely aiding the RAC, and since Blue Cross has followed the pertinent requirements, he cannot be liable for damages. Second, Section 11111(a)(2) of the HCQIA provides:

> Notwithstanding any other provision of law, no person (whether as a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of

having provided such information, to be liable in damages under any law of the United States or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false.

White argues that there is no evidence that he provided any false information at all, let alone any evidence that he *knew* that any of the information he presented was false, and therefore he should be protected from suit.

Singh replies that because Blue Cross has not met the requirements under 42 U.S.C. § 11112(a), White has no immunity.

As noted above in Section II.A.2 of this Opinion, Singh has failed to establish that Blue Cross did not meet the standards required to grant it immunity. Under the text of the HCQIA, White is therefore also granted immunity for his acts assisting the RAC in reaching its "professional review actions." *See* 42 U.S.C. § 11111(a)(1)(D). Accordingly, White's motion for summary judgment is granted and the complaint against him is dismissed.

### B. The Massachusetts State Peer Review Statute

■ The defendants contend that they are protected from liability under the Massachusetts peer review statute, M.G.L. ch. 111, § 203(c) (2000), as well. The statute provides:

> An individual or institution . . . providing information, opinion, counsel or services to a medical peer review committee . . . shall not be liable in a suit for damages by reason of having furnished such information, opinion, counsel or services or by reason of such participation, provided, that such individual or institution acted in good faith and with a reasonable belief that said actions were warranted in connection with or in furtherance of the function of said commit-

tee or the procedures required by this section.

M.G.L. ch. 111, § 203(c). Both defendants assert that they were acting with a reasonable belief that their actions were warranted under the circumstances.

Singh replies that neither defendant acted in good faith or with the reasonable belief that their actions were warranted.

As noted above in Section II.A.2, there is no evidence that the defendants acted in anything but good faith, nor could a factfinder reasonably find that the defendants did not believe their actions to be warranted under the circumstances. Accordingly, even if immunity is improper under the HCQIA, it is appropriate for both defendants under the Massachusetts state statute. For this alternative reason, the defendants' motion for summary judgment is granted and the complaint dismissed.

### III. The Individual Counts

Independent of their assertions of immunity, the defendants also contend that they should be granted summary judgment on the merits of each of the remaining Counts against them.

### A. Breach of Contract

Singh alleges that Blue Cross breached: (1) the implied covenant of good faith and fair dealing; (2) the Audit Agreement; and (3) the HMO Blue Physician Agreement. Singh asserts that Blue Cross acted in bad faith when it breached the provisions of the HCQIA, and therefore should be found in violation of the implied covenant of good faith and fair dealing. He contends that although Blue Cross signed the Audit Agreement, which provided for a random selection of patient files for review, it did not conduct its second audit in this manner. According to Singh, this decision is further evidence of bad faith.

Singh also alleges that the Audit Agreement itself was breached. He asserts that

Blue Cross did not choose a peer reviewer that was mutually agreeable; did not afford Singh an opportunity to discuss the reviewer's findings with the reviewers; and did not notify Singh of his status within 10 days of the peer reviewer's findings.

To these allegations Blue Cross replies that it was Singh who prevented the timely appointment of a mutually agreeable reviewer. The parties agreed on one reviewer, who later decided not to perform the review. Blue Cross invited Singh to suggest other reviewers, but he never replied. After several months, Blue Cross selected its own reviewer. Blue Cross asserts that it acted reasonably and that a party cannot force a breach of a contract by withholding the means of performance. Moreover, Blue Cross notes that Singh has no substantive complaints about the reviewer's qualifications, just that the reviewer was not "mutually agreeable." Singh, by his own admission, never asked to speak with the reviewer, and therefore Blue Cross asserts that it is not its fault that he did not make his grievances known. As for Singh's contention that Blue Cross breached the Audit Agreement by failing to notify him of his status within ten days of the final report, Blue Cross asserts that Singh had already significantly delayed the audit process, and therefore he should not be allowed to hold Blue Cross to firm dates.

Finally, Singh alleges that Blue Cross breached the HMO Blue Physician Agreement. That agreement provides that it would conduct quality and utilization management programs and that "if through its utilization management activity the Plan determines that any portion of a Primary Care Provider service is not medically necessary, the Plan at its discretion may deny payment for these services." Aff. of Nesgos, Ex. W at 13 (HMO Blue Physician Agreement of Singh). Singh contends he

was not provided with education materials to help him keep up to date on best practices. Furthermore, Singh alleges that even if Blue Cross's concerns were warranted, its actions were inappropriate given the alleged injury. Instead of imposing a less harmful remedy such as refusing to pay for Singh's purported "over-utilization" of services, Blue Cross instead sought to terminate Singh's contract. Singh alleges the above actions are material breaches of the agreement.

Blue Cross responds to this set of allegations by asserting that the HMO Blue Physician Agreement allows termination without cause, at any time, so long as 90 days notice is given. However, Blue Cross notes that it never terminated Singh's relationship with it, since the fair hearing review did not adopt the RAC proposal, and therefore Singh has no claim.

Singh has failed to identify material facts that prevent summary judgment from being entered for Blue Cross on these breach of contract allegations. Foremost, there is no evidence in the record of bad faith on the part of Blue Cross, and therefore Singh's implied covenant of good faith and fair dealing contention fails.

Second, it is undisputed that Singh did not ask for an opportunity to review either Clayton's or White's findings, and therefore Blue Cross is not in breach of that provision of the Audit Agreement.

Third, Singh's own "unclean hands" undermine his ability to recover for the alleged breaches of the Audit Agreement. A court has "wide discretion to withhold punishment of behavior which it considers not to warrant so severe a sanction" under the equitable maxim that "he who comes into equity must come with clean hands." *Norton Co. v. Carborundum Co.*, 530 F.2d 435, 442 (1st Cir.1976). Singh failed to respond promptly to at least one of the deadlines imposed by the Audit Agreement. For instance, the parties were to

agree on a "mutually agreeable" peer review consultant within 15 days of Blue Cross' receipt of Singh's patient files, yet Singh failed to respond to Blue Cross' suggested reviewers for over a month because he was on vacation. Aff. of Nesgos, Ex. F (Audit Agreement); Aff. of Curry, Exs. H (Memorandum dated February 24, 1995) and I (Letter from Peter Ally to Blue Cross, dated March 29, 1995). Moreover, after Criss refused to conduct the first audit, Blue Cross provided names of new potential reviewers, but Singh again failed to make a timely selection of one or to propose alternatives, despite his assurances that he would. Aff. of Curry, Ex. J (Letter from Blue Cross to Singh, dated November 13, 1996). Because Singh himself was not reliable in meeting the deadlines imposed by the Audit Agreement, he ought not be allowed to enforce firm deadlines on Blue Cross now.

Finally, with regard to the HMO Blue Physician Agreement, no reasonable factfinder could conclude that Blue Cross breached the agreement. Blue Cross never terminated Singh's relationship with it under the HMO Blue Physician Agreement, and Singh remains on its roster. Accordingly, the only possible claim that Singh can make is that Blue Cross was required under the agreement to conduct certain educational programs and to utilize a lesser punishment than termination with Singh. The language of the HMO Blue Physician Agreement does not support such an interpretation. The HMO Blue Physician Agreement specifically provides that Blue Cross, "may develop and administer" programs. Aff. of Nesgos, Ex. W at 13 (HMO Blue Physician Agreement of Singh). It does not indicate that it "must" do so, nor that it "must" develop any specific type of educational programming. Further, the agreement provides that Blue Cross "at its discretion may deny payment for ... [Not Medically Necessary] services." Aff. of Nesgos, Ex. W at 13 (HMO

Blue Physician Agreement of Singh). With this non-binding language to rely on, Singh's claim for breach of the HMO Blue Physician Agreement fails. Summary judgment is granted for Blue Cross on the breach of contract Count.

### B. Tortious Interference with Business Advantage

■ The elements of tortious interference with business advantage are:

(1) a business relationship or contemplated contract of economic benefit;

(2) the defendant's knowledge of such relationship;

(3) the defendant's interference with the relationship through improper motive or means; and,

(4) the plaintiff's loss of advantage as a direct result of the defendant's conduct.

*Brown v. Armstrong,* 957 F.Supp. 1293, 1304–05 (D.Mass.1997), *aff'd,* 129 F.3d 1252 (1st Cir.1997) (table opinion) (citations omitted).

■ Blue Cross denies that any such claim can be made out because it never disclosed the peer review process to anyone outside of Blue Cross, nor did it ever terminate Singh's right to treat Blue Cross patients or to accept new Blue Cross patients. Moreover, Blue Cross asserts that Singh can show no malice on its part that indicates a purpose outside the scope of normal corporate interest.

Singh alleges that Blue Cross breached several contracts and that word of the Blue Cross investigation had spread in such a manner as to result in a substantial loss of referrals. Singh notes that Blue Cross was aware that Singh had many patients and sought new patient referrals, and that these were the contracts and prospective contracts that were interfered with by Blue Cross.

■ Singh may not speculate about future business relationships when alleging this tort; instead, only a "probable future business relationship anticipating a reasonable expectancy of financial benefit" suffices. *Brown,* 957 F.Supp. at 1305 (citation omitted). Because Singh has presented no evidence of a specific business relationship that was interfered with by Blue Cross, summary judgment is granted for Blue Cross.

### C. Defamation

■ To prove a claim of defamation, a plaintiff must show:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Restatement (Second) of Torts § 558 (1976); *see McAvoy v. Shufrin,* 401 Mass. 593, 597, 518 N.E.2d 513, 517 (1988).

In his Complaint, Singh alleges that the following statements in White's audit report were defamatory:

a. Singh prescribes "large numbers of narcotic analgesics . . . raises serious questions about this practitioner. It may need official review;"

b. "narcotic analgesics are liberally prescribed . . . raise[s] serious questions about the veracity of this practitioner . . . ;"

c. "This practitioner seems to have a low threshold for prescribing narcotic analgesics;" and,

d. "? Public Health Menace."

Complaint ¶ 22. Singh contends that both Blue Cross and White should be found liable for these statements.

#### 1. Blue Cross

■ Blue Cross asserts that it did not publish any of the alleged defamatory

statements outside of the confidential peer review. Moreover, Blue Cross contends Singh has not established malice on its part with regard to the statements.

Singh replies that Blue Cross could not reasonably contend that it believed the statements to be true, given the fact that they were generated by sending a nonrandom selection of patient files to White. Moreover, because the statements allege over-prescription of narcotics, they constitute allegations of a crime, which is defamatory *per se*. *See Draghetti v. Chmielewski*, 416 Mass. 808, 812, 626 N.E.2d 862, 866 (1994).

Singh has not established that Blue Cross published these statements to a third party. Accordingly, no reasonable factfinder could find Blue Cross liable for defamation, and summary judgment is granted for Blue Cross.

## 2. White

White argues that his statements were merely opinions protected by the First Amendment; none of the alleged comments contain assertions of fact. Moreover, although White admits that some opinions that imply undisclosed facts can be actionable, *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 263, 612 N.E.2d 1158, 1162 (1993), he denies that his opinions infer undisclosed facts. White points out that he based his opinions on the records of Singh's patients, and those records were available to the RAC. Therefore, White concludes that because the complete factual basis for White's opinions was known to the RAC, his opinions could not allude to undisclosed facts.

White also asserts that his statements were privileged by the conditional common law privilege between a publisher and a recipient. This common law privilege protects communications "reasonably calculated" to further a legitimate interest shared by the publisher and the recipient. *Catrone v. Thoroughbred Racing Assocs.*, 929 F.2d 881, 887 (1st Cir.1991) (citation omitted). There is a legitimate interest in reviewing the actions of doctors in Massachusetts, and White asserts he was acting to further that interest when he made his statements. White contends that Singh can show no abuse of the privilege through either "actual malice" or excessive publication on White's part to overcome the privilege. White merely distributed his memo to the RAC, which does not show abuse of the privilege.

Singh responds that White cannot reasonably contend that the information in White's reports and audits was "true" given the biased, nonrandom manner in which the patient files were selected. Therefore, at the summary judgment stage, he contends he has established malice. Moreover, the statements by White should be viewed as statements of fact, not opinion. If the statements could be read as either fact or opinion, Singh notes that the issue should go to the jury. *See Aldoupolis v. Globe Newspaper Co.*, 398 Mass. 731, 733–34, 500 N.E.2d 794, 797 (1986).

White is entitled to summary judgment. His statements in the audit report are protected by the common law privilege, and Singh has presented insufficient evidence to surmount the privilege. Furthermore, Singh's contention that the disputed statements are not opinions is without merit. Each of the statements in the complaint obviously conveys the subjective opinions of a reviewing physician. Moreover, these opinions do not purport to convey undisclosed facts. Accordingly, Singh's defamation Count against White is dismissed.

## D. M.G.L. ch. 93A

Blue Cross contends that because it is a charitable organization, it is not engaged in "trade or commerce" for the purposes of

M.G.L. ch. 93A when it is engaged in its "core mission." *See Trustees of Boston Univ. v. ASM Communications, Inc.*, 33 F.Supp.2d 66, 77 (D.Mass.1998). Blue Cross argues that reviewing its doctors' practices is part of its "core mission." Blue Cross also argues that there is no factual evidence suggesting that it willfully acted unfairly and deceptively; that is, there is no "rascality" shown by the evidence. *See Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir.1989).

Singh responds that Blue Cross is in the business of insurance, and therefore falls within the gambit of ch. 93A. *See Planned Parenthood Fed. of America, Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 492–93, 498 N.E.2d 1044, 1051 (1986). He asserts that the combination of all of the above actions, particularly the breaching of contracts, shows "unfair" and unscrupulous actions that should be compensated by M.G.L. ch. 93A.

 There is little need to dwell on this issue: M.G.L. ch. 93A requires conduct that reaches "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Quaker State Oil Refining Corp.*, 884 F.2d at 1513 (quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979)). Singh has shown no conduct by Blue Cross that a reasonable factfinder could find meets this demanding standard. Accordingly, summary judgment for Blue Cross is granted on this ground as well.

### IV.

The defendants' motion is granted and the complaint is dismissed.

It is so ordered.