# United States Court of Appeals
## For the First Circuit

No. 08-1431

JOHN DOE, M.D.,

Plaintiff, Appellant,

v.

MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Boudin, Selya, and Stahl, Circuit Judges.

Michael A. Duddy, with whom Kelly, Remmel & Zimmerman was on brief, for appellant.
Eric Fleisig-Greene, Attorney, Appellate Staff, with whom Gregory G. Katsas, Assistant Attorney General, Civil Division, Paula D. Silsby, United States Attorney, and Mark B. Stern, Attorney, Appellate Staff, were on brief, for appellee.

January 14, 2009

**SELYA**, <u>Circuit Judge</u>.  This appeal requires us to construe the word "investigation" as that word is used in a provision of the Health Care Quality Improvement Act (HCQIA), a statute that directs hospitals and other health care entities to report to the Secretary of Health and Human Services (the Secretary) in the event that a physician surrenders his clinical privileges while he is "under an investigation" for suspected incompetence or improper professional conduct.  42 U.S.C. § 11133(a)(1)(B)(i).  The question is one of first impression at the federal appellate level.

In the underlying administrative proceeding, the Secretary concluded that an investigation is ongoing for purposes of the HCQIA until the hospital's decisionmaking process runs its course and the hospital either takes a final action or formally closes the probe.  The appellant, a physician reported to the Secretary under section 11133(a)(1)(B)(i), challenged the Secretary's interpretation of the word "investigation."  The district court rejected this challenge and upheld the Secretary's action.  After careful consideration, we affirm.

## I.  BACKGROUND

Generally speaking, information gathered pursuant to the reporting provisions of the HCQIA is confidential.  <u>See</u> <u>id</u>. § 11137(b)(1).  But the statute expressly provides that information presented "in a form that does not permit the identification of any

-2-

particular health care entity, physician, other health care practitioner, or patient shall not be considered confidential." Id. In the case at hand, the protagonists' identities and the specific details of the alleged misconduct are easily separated from the central legal question. Accordingly, we sketch the background of the case with the aid of pseudonyms and generalities. That course allows us to balance two important but sometimes conflicting interests: on the one hand, safeguarding the privacy of physicians and other health care professionals; on the other hand, providing public access to judicial decisions.

On July 26, 2005, an operating room nurse at the XYZ Hospital (the name is fictitious) filed a written complaint against the appellant (a physician whom we refer to by the alias "Dr. Doe"). The complaint charged that the appellant had threatened the nurse.

The following day, the medical staff executive committee temporarily suspended Dr. Doe's privileges and appointed an ad hoc investigating committee (the AHC) to inquire into the nurse's allegations. On August 2, 2005, the AHC reported to the executive committee that the nurse reasonably perceived Dr. Doe's actions as threatening.

Three days later, the executive committee met to discuss both the report and Dr. Doe's status. Following that discussion, the executive committee proposed that Dr. Doe be allowed to return

to work so long as he agreed to certain contractual modifications, including provisions for regular proctoring and psychological evaluations. On August 11, Dr. Doe rejected this proposal and voluntarily relinquished his clinical privileges. The Hospital accepted his resignation on August 19.

Believing that Dr. Doe had resigned while "under an investigation," the Hospital reported his resignation to the National Practitioner Data Bank (the NPDB), a data bank established by the Secretary as a repository for reports filed pursuant to the HCQIA. See 45 C.F.R. § 60.1.

On September 19, Dr. Doe requested administrative review of the Hospital's filing. See id. § 60.14. He contended that the Hospital's investigation had ended when the AHC presented its report to the executive committee and, therefore, that he had not resigned while under an investigation. An exchange of views followed.

On May 25, 2007, the Secretary issued a written decision in which he ruled that the Hospital appropriately had reported the appellant to the NPDB. The Secretary premised this ruling on a statement that "[a]n investigation is . . . considered ongoing until the health care entity's decision making authority takes a final action or formally closes the investigation." Because the executive committee had neither taken a final disciplinary action nor formally closed its inquiry when Dr. Doe resigned, the

-4-

Secretary found that Dr. Doe was still "under an investigation" at that moment. Consequently, the Hospital had a duty to report the resignation under 42 U.S.C. § 11133(a)(1)(B)(i).

The appellant challenged this ruling in a suit brought against the Secretary under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. The parties cross-moved for judgment on the administrative record. The district court, in a sealed opinion, ruled in the Secretary's favor. This timely appeal ensued.

## II.  ANALYSIS

We review the district court's decision de novo, applying the same standards to the Secretary's final action that the district court was bound to apply. See Mass. ex rel. Div. of Marine Fisheries v. Daley, 170 F.3d 23, 28 (1st Cir. 1999); Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). We will reverse only if the Secretary's determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We are not married to the lower court's reasoning but may uphold its decision on any ground made manifest by the record. See InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003).

The sole issue on appeal is the propriety of the Secretary's interpretation of the word "investigation" as that word

is used in the HCQIA reporting provision, quoted in the margin.[1] The Secretary has determined that an investigation is ongoing (and, therefore, a matter is under investigation) until a health care entity makes a final decision or formally closes the probe, even if the entity is no longer gathering facts but is merely deliberating about what course of action it should follow.

The appellant argues that the Secretary has cast too wide a net. He maintains that the word "investigation," as used in the statute, refers only to the fact-gathering phase of the inquiry.

In dealing with these dueling interpretations, a threshold question looms: What level of deference, if any, is due to the Secretary's interpretation? We tackle that question first and then proceed to the merits.

### A. **The Deference Question**.

It cannot be gainsaid that the Secretary possesses authority to promulgate regulations implementing the HCQIA. See, e.g., 42 U.S.C. § 11136. Withal, the Secretary has not exercised this rulemaking authority to set forth his interpretation of the

---

[1] In pertinent part, the provision imposes a reporting obligation on any health care entity that

> accepts the surrender of clinical privileges of a physician —
>     (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct . . . .

42 U.S.C. § 11133(a)(1)(B).

word "investigation." Instead, the Secretary's interpretation must be gleaned from (i) an agency manual, the NPDB Guidebook (the Guidebook), issued in September of 2001, and (ii) the Secretary's decision in this case. The appellant contends that these "informal" interpretations do not warrant deference under the familiar rubric of Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984), but must be evaluated under the more neutral framework limned in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). The Secretary counters that Chevron offers the appropriate frame of reference. The district court nimbly sidestepped this question, vouchsafing that the Secretary's interpretation of the word was unimpugnable regardless of what level of deference attached.

In the aftermath of the Court's opinion in United States v. Mead Corp., 533 U.S. 218, 226-27 (2001), the level of deference owing to informal agency interpretations is freighted with uncertainty. See Lisa Schultz Bressman, How Mead Has Muddled Judicial Review of Agency Action, 58 Vand. L. Rev. 1443, 1457-69 (2005) (reviewing divergent applications of Mead by various courts of appeals). The Mead Court seems to have contemplated the application of Chevron deference to most statutory interpretations that are the fruit of notice-and-comment rulemaking or formal adjudications. See Mead, 533 U.S. at 229-31; but cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Serv., 545 U.S. 967, 1004

(2005) (Breyer, J., concurring) (stating that "the existence of a formal rulemaking proceeding" is not "a sufficient condition for according Chevron deference to an agency's interpretation of a statute").  In some ways, however, Mead is unhelpful: for instance, the decision does not clarify the circumstances in which Congress should be deemed to have intended an informal agency interpretation to carry the force of law and, thus, attract Chevron deference. See Mead, 533 U.S. at 231.  Mead indicates, however, that even if an informal agency interpretation is deemed not to warrant Chevron deference, it may nonetheless lay claim to a lesser degree of deference under the Skidmore banner.  Id. at 234.

The case at hand falls into this gray area.  The Guidebook is an agency manual.  It is not a product of notice-and-comment rulemaking, nor was it ever published in the Federal Register, which makes only a glancing reference to it, see Notice Announcing Opening Date of NPDB, 55 Fed. Reg. 31,239-01 (Aug. 1, 1990).  Given these facts, we do not believe that the Guidebook is entitled to Chevron deference.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000); Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 73 (1st Cir. 2006); De La Mota v. U.S. Dep't of Educ., 412 F.3d 71, 79 (2d Cir. 2005); Pub. Citizen, Inc. v. U.S. Dep't of HHS, 332 F.3d 654, 660 (D.C. Cir. 2003).

This leaves the Secretary's decision.  Congress explicitly empowered the Secretary to establish dispute resolution

procedures relative to HCQIA filings. See 42 U.S.C. § 11136(2). In response, the Secretary promulgated a regulation that established an adjudicative process — a process that, among other things, provides for secretarial review of written information submitted by both the reporting entity and the reported physician, as well as the issuance of a final administrative determination anent the accuracy of reported information. See 45 C.F.R. § 60.14. The decision in this case was a creature of this adjudicative process. Although secretarial review is not governed by the trial-like procedures characteristic of formal agency adjudications, see, e.g., 5 U.S.C. §§ 554, 556, 557, several courts have afforded Chevron deference to agency adjudications similar in type and kind to the agency action at issue here, see, e.g., Am. Fed'n of Gov't Employees, Local 446 v. Nicholson, 475 F.3d 341, 353-54 (D.C. Cir. 2007); Cleveland Nat'l Air Show, Inc. v. U.S. Dep't of Transp., 430 F.3d 757, 763-64 (6th Cir. 2005); Davis v. EPA, 348 F.3d 772, 779 & n.5 (9th Cir. 2003). Other courts, however, have declined to afford Chevron deference to the fruit of informal agency adjudications. See, e.g., Mead, 533 U.S. at 221; Am. Fed'n of Gov't Employees, Local 2152 v. Principi, 464 F.3d 1049, 1057 (9th Cir. 2006).

This is an interesting legal conundrum, but the task of a federal appellate court is to resolve particular cases and controversies, not merely to satisfy intellectual curiosity

(whether its own curiosity or that of others).  In the last analysis, we agree with the district court that the level of deference is not determinative here; whether viewed through the prism of Chevron or the less forgiving prism of Skidmore, the Secretary's interpretation of the word "investigation" withstands scrutiny.

Thus, we bypass the question of whether the Secretary's decision engenders Chevron deference.  Instead, we assume, favorably to the appellant and in line with his argument, that the Secretary's interpretation should be evaluated under the Skidmore standard.  We proceed on that assumption.

## B.  **The Merits**.

The nuances of the Skidmore standard are not cut-and-dried.  See, e.g., Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1365-66 (Fed. Cir. 2005) (discussing varying formulations).  The Supreme Court has characterized Skidmore as requiring courts to defer to agency interpretations of statutes within the agency's ken "to the extent that those interpretations have the 'power to persuade.'"  Christensen, 529 U.S. at 587 (quoting Skidmore, 323 U.S. at 140).  If this is not an unabashed tautology, it must mean something more than that deference is due only when an inquiring court is itself persuaded that the agency got it right.  Otherwise, Skidmore deference would not be deference at all.

What the Skidmore standard entails is a sliding-scale approach under which the degree of deference accorded to an agency interpretation hinges on a variety of factors, such as "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and the] consistency [of its interpretation] with earlier and later pronouncements." Skidmore, 323 U.S. at 140. That compendium is not exhaustive; other factors may weigh in the balance. See Kristin E. Hickman & Matthew D. Krueger, In Search of the Modern Skidmore Standard, 107 Colum. L. Rev. 1235, 1259 (2007) (identifying "thoroughness, formality, validity, consistency, and agency expertise" as factors in an agency's power to persuade).

These factors are meant to test the seriousness of, and therefore the respect due to, the process that underlies the agency's interpretation. The mix of factors, once assayed, either contributes to or detracts from the power of an agency's interpretation to persuade. See Skidmore, 323 U.S. at 140. We turn, then, to how these factors impact the Secretary's interpretation of the word "investigation" as that word is used in 42 U.S.C. § 11133(a)(1)(B)(i).

We start with formality and thoroughness. The record makes manifest that the Secretary's decision was not the product of a strictly formal adjudication. Even so, not all informal agency adjudications stand on the same footing. Here, the adjudication progressed according to a previously established panoply of

-11-

structured rules that allowed for written submissions by all affected parties. See 45 C.F.R. § 60.14(c). Greater weight ordinarily is due to interpretations that result from a structured interpretive process as opposed to a catch-as-catch-can interpretive process. See, e.g., High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 648 (9th Cir. 2004); Structural Indus., Inc. v. United States, 356 F.3d 1366, 1370 (Fed. Cir. 2004).

The Secretary plainly understood the need for in-depth consideration of the disputed issue. He initially set forth his construction of the word "investigation" in the Guidebook, a comprehensive manual of general applicability. Normally, greater deference is due to an interpretation that "is not merely ad hoc . . . but is applicable to all cases." Chauffeur's Training Sch., Inc. v. Spellings, 478 F.3d 117, 129 (2d Cir. 2007); accord Estate of Landers v. Leavitt, 545 F.3d 98, 110 (2d Cir. 2008). So it is here.

The Secretary then reiterated his understanding of the word "investigation" in his decision in this case. Several aspects of the decision indicate that it was the product of thorough consideration. First, the decision was issued by the Secretary himself — the highest-ranking official in the Department of Health and Human Services (HHS). Second, the procedures employed encouraged the operation of the deliberative process.

In particular, there was a meaningful give-and-take. In a letter to the Hospital dated May 26, 2006, the agency's dispute resolution manager set out the agency's working definition of an "investigation" and requested further information. The appellant received a copy of this letter. On June 6, 2006, the appellant responded, controverting the agency's working definition. The issue was, therefore, precisely framed and the protagonists had the opportunity to confront each other's views. This sort of open exchange is a badge of thoroughness. See, e.g., Rubie's Costume Co. v. United States, 337 F.3d 1350, 1356 (Fed. Cir. 2003).

Furthermore, the Secretary's decision fully engaged the appellant's proposed interpretation of section 11133(a)(1)(B)(i). The Secretary found that interpretation deficient largely because it failed to square with the policies underlying the HCQIA. In support, the Secretary highlighted relevant portions of both the statutory scheme and its legislative history. This detailed exegesis makes it transparently clear that the Secretary's interpretation was a product of thorough consideration. See, e.g., W. Union Tel. Co. v. FCC, 665 F.2d 1126, 1143 (D.C. Cir. 1981) (upholding, under Skidmore, an agency interpretation that was based upon thorough analysis of statute and legislative history).

Moving to other factors, expertise and consistency counsel in favor of honoring the Secretary's interpretation. As to the former, HHS, over which the Secretary presides, has broad

-13-

oversight of physician performance. Given the huge federal stake in the funding of Medicare, Medicaid, and related programs, the Secretary has had a powerful incentive to develop a body of knowledge about problems affecting physician performance. See, e.g., Estate of Landers, 545 F.3d at 107 (noting high degree of expert knowledge required to run programs such as Medicare and Medicaid). Indeed, the Secretary is charged with determining whether and when a physician's rights to participate in these complex programs should be suspended where, for example, the physician surrenders his license to practice in a particular state while under investigation for misconduct or incompetence. See 42 U.S.C. § 1320a-7(b)(4)(B). Thus, the area in which the disputed interpretation operates is within the heartland of the Secretary's expertise.

As to consistency, there is no evidence that the Secretary has ever interpreted the word "investigation," as used in the HCQIA, in a manner inconsistent with the interpretation that he advances here. The Secretary initially articulated this interpretation in the Guidebook, which was published in 2001. In adjudicating the appellant's administrative complaint, he faithfully applied that definition. His final decision observed that the challenged interpretation reflected "long established policy," and the appellant has not contested that observation. The consistency of the Secretary's interpretation, over time, furnishes

-14-

some degree of support for deferring to that interpretation. See N. Haven Bd. of Educ. v. Bell, 456 U.S. 512, 522 n.12 (1982); Estate of Landers, 545 F.3d at 107; see also Barnhart v. Walton, 535 U.S. 212, 219 (2002).

We turn now to the most salient of the factors that inform an assessment of persuasiveness: the validity of the agency's reasoning. This inquiry does not focus on the interpretation per se but, rather, on whether the agency has consulted appropriate sources, employed sensible heuristic tools, and adequately substantiated its ultimate conclusion. See De La Mota, 412 F.3d at 80.

Here, the Secretary made good use of available interpretive resources. In particular, he construed the word "investigation" in light of the overall structure and evident purpose of the statutory scheme. Those were potentially fertile grounds for assistance in carrying out the mission of statutory construction. See Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006).

By the same token, the Secretary handled these interpretive resources in a logical and intellectually disciplined manner. He began by remarking a broad congressional purpose: "to improve the quality of health care by encouraging hospitals to identify and discipline practitioners who engage in unprofessional behavior." This went hand in glove with the related goal of

"restrict[ing] the ability of incompetent practitioners from moving State to State without disclosure or discovery of [a] previous adverse action . . . history." The text of the statute bears out this statement of the overarching congressional purpose. See, e.g., 42 U.S.C. § 11101(2). The Secretary's reasoning also is buttressed by the statute's legislative history, which evinces Congress's concern that "hospitals too often accept 'voluntary' resignations of incompetent doctors in return for the hospital's [sic] silence about the reasons for the resignations." H.R. Rep. No. 99-903, at 3 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6385; see H.R. Rep. No. 99-903, at 15 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6397 (commenting that hospitals too readily "resort to 'plea bargains' in which a physician agrees to [a surrender of privileges] in return for the health care entity's promise not to inform other health care entities about the circumstances of the physician's surrender of privileges").

Reasoning from this overarching congressional purpose, the Secretary concluded that Congress did not intend to construct an easily accessible escape hatch that would permit beleaguered physicians to elude the reach of the HCQIA's reporting requirement. He noted that the HCQIA contemplates reporting both when a hospital takes certain actions implicating a physician, 42 U.S.C. § 11133(a)(1)(A), and when a physician resigns during the currency of an investigation, id. § 11133(a)(1)(B)(i). A grudging view of the

duration of an investigation, such as that proposed by the appellant, would create a gap between the completion of fact-gathering and the taking of a final disciplinary action. During this "gap period," a physician could resign with impunity. That easy escape would operate at cross-purposes with the goal of the reporting requirement.

Conversely, interpreting the word "investigation" more expansively affords seamless coverage of the period from the start of an inquiry until the taking of a final disciplinary action. That prevents the creation of a gap. At the same time, it serves Congress's evident purpose.

This is sound reasoning. In light of it, the Secretary's ensuing interpretation of the word "investigation," while not inevitable, is eminently sensible.

In the face of this interpretation, the appellant looses a barrage of counter-arguments aimed at derailing any claim to Skidmore deference. His initial attack centers on plain meaning. His thesis is that the plain meaning of the word "investigation" is limited to fact-gathering.

The appellant's premise is undeniably correct: the plain meaning of words in the text of a statute constitutes the proper starting point for interpreting that statute. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999); Aguilar v. U.S. Immig. & Customs Enf., 510 F.3d 1, 8 (1st Cir. 2007). But "[i]n the last

analysis, words are like chameleons; they frequently have different shades of meaning depending upon the circumstances." United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004). The word "investigation" exemplifies this truism.

That word commonly is used to refer to the process of gathering facts. See, e.g., Random House Dictionary of the English Language 1004 (2d ed. 1987). However, it also is commonly used in a broader sense to refer to a "detailed examination" or "searching inquiry." Webster's Third New Int'l Dictionary of the English Language 1189 (1993). Congress itself has used the word in that broader sense, see, e.g., 15 U.S.C. § 1681b(b)(4)(D)(ii) (defining "national security investigation"), as have the courts, see, e.g., United Eng'g & Forging v. United States, 779 F. Supp. 1375, 1393 (C.I.T. 1991) (concluding that imports were "subject to investigation" because they remained "under consideration"). Given the range of meanings associated with the word "investigation," we think that the Secretary was obliged in this instance to look beyond raw language and to consider the larger context of the HCQIA. That is exactly what the Secretary did.

Next, the appellant contends that the Secretary's understanding conflates "investigation" with two other terms that appear in the text of the HCQIA, namely, "professional review activity" and "professional review action." This contention lacks force.

-18-

We do not doubt that a legislative body usually means different things when it uses varying terminology in a single statute. See, e.g., Ariz. Health Care Cost Containment Sys. v. McClellan, 508 F.3d 1243, 1250 (9th Cir. 2007); Vonage Holdings Corp. v. FCC, 489 F.3d 1232, 1240 (D.C. Cir. 2007). Contrary to the appellant's importunings, however, the Secretary's understanding of the word "investigation" does not make the word synonymous with either a "professional review activity" or a "professional review action."

The HCQIA defines a "professional review activity" as an activity designed to "change or modify" a physician's clinical privileges. 42 U.S.C. § 11151(10)(C). The appellant suggests that this term encompasses the entire process through which a hospital alters a physician's clinical privileges — that is, from the commencement of fact-gathering through the final decision.

We reject this construction, instead agreeing with the Secretary that the term "professional review activity" refers, one by one, to each of the discrete activities that a hospital undertakes during the course of its investigation (e.g., accepting a complaint, deciding to investigate, appointing an investigating committee, conducting fact-gathering, preparing a report, and so on and so forth, up to the point at which a professional review action is taken). See Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 634 (3d Cir. 1996) (upholding district court's determination that

-19-

"professional review activities" are "preliminary investigative measures taken in 'a reasonable effort to obtain the facts' relevant to a possible change in a physician's privileges"); Singh v. Blue Cross & Blue Shield of Mass., Inc., 182 F. Supp. 2d 164, 171 (D. Mass. 2001) (holding that "professional review activities" were "steps in an investigation that ultimately led to an 'action'"), aff'd, 308 F.3d 25 (1st Cir. 2002). We need not itemize the inventory of professional review activities today. For present purposes, it suffices to say that the Secretary's interpretation of the term "investigation" is not coterminous with his interpretation of the term "professional review activity" because the former encompasses a myriad of the latter.

So too the term "professional review action." That term denotes an adverse "action or recommendation . . . taken or made in the course of a professional review activity." 42 U.S.C. § 11151(9). The Secretary's interpretation holds that an investigation terminates when a final action is taken. That action is a "professional review action" within the purview of the statute. Thus, while an investigation may culminate in a professional review action, the Secretary's interpretation gives a distinct meaning to each term. Consequently, he has not conflated their meanings.

In a related vein, the appellant suggests that the Secretary's interpretation of "investigation" makes the word

synonymous with yet another statutory term: "formal peer review process." 42 U.S.C. § 11151(4)(A). Though the latter term is not defined in the HCQIA, the Secretary's implementing regulations state that the phrase "formal peer review process" refers to "the conduct of professional review activities through formally adopted written procedures which provide for adequate notice and an opportunity to be heard." 45 C.F.R. § 60.3. As such, the formal peer review process refers only to a particular type of investigation. The two terms, as used by the Secretary, do not duplicate each other.

In a further fusillade, the appellant maintains that the Secretary misperceived the core purpose of the HCQIA. He argues, in essence, that the Secretary erred in inferring a general congressional intent to encourage reporting. In support, he notes that the HCQIA does not require reporting of all disciplinary measures imposed upon physicians but, rather, limits itself to professional review actions that adversely affect a physician's clinical privileges for longer than thirty days. See 42 U.S.C. § 11133(a)(1)(A). Building on this foundation, he posits that Congress most likely contemplated piecemeal reporting under very specific circumstances.

This is whistling past the graveyard. We believe that the Secretary supportably discerned a broad congressional purpose to improve the delivery of health care by mandating the reporting

of significant disciplinary measures taken against physicians and curtailing the ability of physicians to abort inquiries into potential misconduct. The legislative history, alluded to above, makes this purpose abundantly clear.

At oral argument, the appellant added a new twist to this contention. He theorized that Congress must have intended piecemeal reporting as a means of allowing private parties maximum flexibility in adjusting the terms of employment relationships. We demur. The legislative history leaves little doubt but that Congress was concerned with putting an end to the sort of private deals that the appellant claims the HCQIA is meant to foster. See, e.g., H.R. Rep. No. 99-903, at 3, 15 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6385, 6397.

Finally, the appellant claims that the Secretary erroneously failed to consult the Hospital's bylaws. This charge is unfounded.

A hospital's bylaws may shed light on whether the institution has initiated an investigation within the purview of the statute and, if so, whether that investigation is ongoing. See, e.g., Simpkins v. Shalala, 999 F. Supp. 106, 115-16 (D.D.C. 1998). The Secretary, in the Guidebook, has recognized that a hospital's bylaws may be useful in such ways. See, e.g., Guidebook, at E-21.

-22-

That is not to say, however, that the meaning of the word "investigation," as that word is used in the statute, will vary from case to case depending on a particular hospital's bylaws. The federal judiciary and the agency to which the interpretive task has been entrusted have independent responsibilities for fashioning a global definition, and a hospital cannot frustrate that definition through its bylaws. If, say, a hospital's bylaws used the word "investigation" to describe a phenomenon that ended upon the completion of fact-gathering, the Secretary would not be compelled to interpret Congress's use of the word "investigation" in lockstep with that idiosyncratic definition.

In all events, the bylaw provisions cited by the appellant are not inconsistent with the Secretary's interpretation. They provide in substance that the AHC, once assembled, must submit its written report to the medical staff's executive committee within ten days. It is simply too much of a stretch to say, as the appellant urges, that this means that the investigation is formally concluded at that point. After all, the same bylaws give the executive committee ten additional days to take action on the AHC's report.[2]

To recapitulate, the Secretary has performed a careful, well-reasoned analysis of the meaning of the word "investigation"

---

[2] Notably, the appellant tendered his resignation during this second ten-day period, even though it was not accepted until after that period had expired.

-23-

as that word is used in the HCQIA. He consulted all the conventional sources, relied upon appropriate considerations (such as the overall structure of the HCQIA, the congressional purpose behind it, and the most efficacious means of effectuating that purpose), and reasoned convincingly to a conclusion. That conclusion flows logically from the materials consulted and reflects long-standing policy, consistently applied. Given these factors and given the Secretary's expertise, Skidmore demands that we defer to his persuasive and well-supported view that an "investigation" ends only when a health care entity's decisionmaking authority either takes a final action or formally closes the investigation.

## III. CONCLUSION

Skidmore requires courts to walk a fine line, and we have endeavored to do so here. For the reasons elucidated above, we find the Secretary's interpretation deserving of Skidmore deference. Thus, we agree that the Hospital duly reported the appellant's resignation to the NPDB pursuant to 42 U.S.C. § 11133(a)(1)(B)(i). We need go no further. We hold that the lower court did not err in rejecting the appellant's attempt to reverse the Secretary's action.

**Affirmed**.