# United States Court of Appeals
## For the First Circuit

No. 21-1125

JUAN CARLOS MONTOYA, on behalf of himself and all others
similarly situated; MAURICE SMITH; JEAN PAUL BRICAULT, JR.,

Plaintiffs, Appellees,

v.

CRST EXPEDITED, INC.; CRST INTERNATIONAL, INC.,

Defendants, Appellants.

No. 21-1482

JUAN CARLOS MONTOYA, on behalf of himself and all others
similarly situated; MAURICE SMITH, on behalf of himself and all
others similarly situated; JEAN PAUL BRICAULT, JR., on behalf of
himself and all others similarly situated; JOSE TORRES ROSADO,
on behalf of himself and all others similarly situated; AUSTIN
CODDINGTON, on behalf of himself and all others similarly
situated; KEVIN HAMILTON, on behalf of himself and all others
similarly situated; LARRY WIMBISH, on behalf of himself and all
others similarly situated; RINEL TERTILUS, on behalf of himself
and all others similarly situated,

Plaintiffs, Appellees,

v.

CRST EXPEDITED, INC.; CRST INTERNATIONAL, INC.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, <u>U.S. District Judge</u>]

Before

Barron, Chief Judge,
Lipez and Howard, Circuit Judges.

————————————

James H. Hanson, with whom James A. Eckhart, E. Ashley Paynter, Scopelitis, Garvin, Light, Hanson & Feary, P.C., Wesley S. Chused, Daniel R. Sonneborn, Gregory P. Hansel, Elizabeth A. Olivier, Randall B. Weill, Jonathan George Mermin, and Preti, Flaherty, Beliveau & Pachios, Chartered, LLP were on brief, for appellants.

Hillary Schwab, with whom Rachel Smit, Fair Work, P.C., Andrew S. Schmidt, Peter G. Mancuso, and Andrew Schmidt Law, PLLC were on brief, for appellees.

Richard Pianka and ATA Litigation Center on brief for American Trucking Associations, Inc., amicus curiae.

Seema Nanda, Jennifer S. Brand, Rachel Goldberg, Heather Maria Johnson, and Counsel for the Secretary of Labor on brief for the United States Secretary of Labor, amicus curiae.

Michaela C. May and Bennett & Belfort, P.C. on brief for the Massachusetts Employment Lawyers Association and the National Employment Law Project, amici curiae.

Nicole Horberg Decter, Jasper Groner, and Segal Roitman, LLP on brief for the Massachusetts American Federation of Labor and Congress of Industrial Organizations, amicus curiae.

————————————

December 12, 2023

————————————

**LIPEZ**, <u>Circuit Judge</u>.  Motor carriers CRST Expedited and CRST International ("CRST") use a "team driving model" to transport goods across the country, whereby two drivers ride in a truck and alternate their time between driving and resting in the truck's sleeper berth.  This collective action requires us to decide whether, as a matter of first impression, the time these long-haul truck drivers spend in the sleeper berth is "on-duty" time within the meaning of Department of Labor regulations, and, if so, whether CRST must compensate a driver who is on duty for 24 hours or more for time that driver spends in the sleeper berth in excess of eight hours within a full 24-hour period.  Granting summary judgment for former CRST drivers Juan Carlos Montoya and others,[1] the district court determined that such time is compensable work.  We affirm.

**I.**

**A. Background**

CRST is a motor carrier providing trucking services across North America that runs a driver training program for aspiring long-haul truck drivers.  Montoya and the other members of the collective action were trainee long-haul truck drivers

---

[1] Montoya and the other named plaintiffs originally brought separate actions against CRST on their own behalf and on behalf of others similarly situated.  <u>See</u> 29 U.S.C. § 216(b).  The separate cases subsequently were combined through settlement negotiations that disposed of all claims except the sleeper berth claim.  For convenience, we refer throughout our opinion only to Montoya's action.

participating in CRST's program. The training program is comprised of four phases. The first two phases are a practicum enabling trainee drivers to earn a commercial driver's license and a companion classroom-based course with instruction on the practical use and application of these licenses.[2] During phase three, when trainee drivers sign an eight-to-ten-month employment contract and CRST begins to compensate them for their driving, new trainees are matched with a more experienced CRST driver to complete approximately four weeks of team driving. When the more experienced driver determines that the trainee driver is ready, the trainee advances to stage four, in which the trainee is matched with a co-driver to complete the additional seven to nine months of the contract term as a team driver.

CRST's team-based driver training program is uncommon. CRST is one of the few companies nationwide that hires inexperienced drivers and trains them in teams. The team driving model assigns to each truck two drivers who take turns driving the vehicle. These drivers structure their driving time in accordance with the "Hours of Service" regulations of the United States Department of Transportation ("DOT"). The regulations specify, in relevant part, that a driver may be "on

_____

[2] Some drivers who already have a commercial driver's license and relevant driving experience may advance directly to phase two.

duty" for a maximum of fourteen hours at a time. 49 C.F.R. § 395.3(a)(2). Within this fourteen-hour period, a driver may only drive for a total of eleven hours; the remaining three hours may be spent taking care of non-driving responsibilities, such as loading or unloading the vehicle. See id. § 395.3(a)(3). After fourteen hours of on-duty time, a driver must take at least ten consecutive hours of time "off duty" as defined by the DOT regulations, during which the driver cannot drive, load, or unload the vehicle, or have other responsibilities related to the truck and its equipment. See id. §§ 395.3(a)(1); 395.2. The dispute before us concerns this "off-duty" time only.

CRST's team-driving approach typically results in one person driving while the other driver is off duty (for purposes of the DOT regulations) in the sleeper berth of the truck.[3] The drivers can then switch when the off-duty driver has completed the required ten-hour period. Drivers regularly take more than ten hours of sleeper berth time at a stretch, depending on how driving teams structure their driving time; indeed, some drivers have spent up to sixteen hours in the sleeper berth of the

---

[3] Off-duty time can also be spent in the passenger seat of the truck, but the record indicates that drivers spend most of their off-duty time in the sleeper berth.

truck.[4]  CRST's approach allows the company to keep their trucks in near continuous motion, for multiple days, while complying with DOT regulations limiting the hours a driver can spend behind the wheel.  The drivers "trade . . . on and off until they get from origin to destination," thereby allowing CRST to "get twice the utilization out of the truck and keep that cargo moving . . . twenty hours a day or more."

The sleeper berth of the truck is a driver's "living quarters" during these long stretches of time on the road.  The space typically contains bunk beds, a sitting area, and perhaps a microwave or small refrigerator, but does not have a bathroom even though drivers are frequently there for ten or more hours at a time while the truck is in motion.  Sleeper berths must, at a minimum, measure 24 inches in width, 75 inches in length, and 24 inches in height (which is measured from the highest point of

---

[4] The record provides an example of how team drivers may schedule their driving.  Driver A may start the trip as the driving teammate and drive for ten hours.  During this time, Driver B is in the sleeper berth.  After ten hours, the drivers switch and Driver B drives for ten hours while Driver A rests.  The drivers continue to switch after each ten-hour period until they get to their destination.  Alternatively, because drivers "have a fourteen-hour window" before they must take ten hours off, Driver A might complete a fourteen-hour shift of driving and truck maintenance while Driver B spends fourteen hours in the sleeper berth, and the drivers then switch.  The record does not clarify under what conditions a driver would be in the sleeper berth for sixteen hours, considering that drivers must rest after each fourteen-hour period, but the parties do not dispute that "[t]here are several days on which CRST has recorded twelve to sixteen hours of sleeper berth and other off-duty time . . . for the named [plaintiffs]."

the mattress on the top bunk). 49 C.F.R. § 393.76(a)(1). When in the sleeper berth, drivers are at liberty to pursue their own activities within the confines of the space and facilities provided to them. Drivers can make food, connect to the internet if internet connectivity is available, read, watch television or movies, and sleep.[5] When the truck is not in motion -- for example, when the teammates swap over at a rest stop -- drivers are also able to leave the truck and attend to their needs before resuming driving. CRST explains that "[g]enerally [the drivers] eat and take care of personal hygiene during these transitions." Drivers are free to manage their time and schedules during a journey "[a]s long as they're still on their plan to deliver that load on time[.]" In emergency situations, the non-driving teammate may also be called upon to help with a maneuver or provide emergency assistance, even though he is "off duty" per the DOT's regulations. See 49 C.F.R. § 395.1(b)(2).

Driver compensation is covered by a different set of regulations, issued by the United States Department of Labor ("DOL"). The DOL regulations, which are discussed in detail below, provide that employers can exclude a sleeping period of no more than eight hours per day when calculating an employee's

---

[5] The record lacks information on whether CRST imposes rules on drivers for their sleeper berth time beyond the DOT regulations.

compensation. See 29 C.F.R. § 785.22.[6] CRST calculates the pay owed to team drivers according to the total number of miles dispatched to the team for the shipment. Each member of the driving team is paid one half of the total number of miles attributed to the shipment at a rate of pay that corresponds with the driver's level of experience, with less experienced drivers receiving a lower rate of pay per mile. Thus, the hourly wage of the drivers can be calculated by dividing their received pay by the total number of hours worked during the pay period. CRST does not count time spent in the sleeper berth as hours worked and so does not include the sleeper berth hours in the calculation of the drivers' hourly wage. If the sleeper berth time is counted as hours worked, however, CRST's drivers receive an hourly wage that falls short of the minimum wage under the FLSA.[7] See 29 U.S.C. § 206.

---

[6] 29 C.F.R. § 785.21 provides that "[a]n employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy." The compensability of sleeper berth time for drivers with periods of duty less than 24 hours is not at issue in this appeal.

[7] Montoya's salary for the first pay period in November 2014 provides a clear example of how CRST's formula works. Montoya began his phase three training on October 28, 2014, and he began earning $0.25 per mile, in accordance with CRST's pay scale for drivers of his level of experience. In November 2014, Montoya completed a 1,871-mile trip from Cedar Rapids, Iowa, to Portland, Oregon. Since CRST pays its team drivers for one half of the total miles on a trip, Montoya was paid for 935.5 miles. At $0.25 per mile, this trip paid Montoya $233.88. He also received a signing bonus of $100, resulting in a total wage of

- 8 -

## B. Procedural history

Montoya filed suit against CRST in January 2016 on behalf of himself and others who had participated in CRST's driver training program.[8] Montoya claimed, in relevant part, that CRST's compensation policies violate the Fair Labor Standards Act, 29 U.S.C. §§ 201-219, because CRST does not pay its drivers for hours spent in the sleeper berth that exceed the DOL's excludable eight-hour sleeping period, and thus does not meet the hourly minimum wage required by the FLSA. Montoya moved for summary judgment on this claim. Basing its decision largely on its interpretation of the DOL regulations, the United States District Court for the District of Massachusetts found

_____

$333.88. Montoya's payroll statement reflects that he worked a total of 33 hours during this pay period, per CRST's definition of what constitutes hours worked. Montoya also logged 15.61 hours of "excess sleeper berth time" during this period, meaning time exceeding eight hours per day spent in the sleeper berth. If the excess sleeper berth time is not included when calculating Montoya's hourly pay, he received an hourly wage of $10.12 ($333.88/33 hours). If the excess sleeper berth time is included, Montoya received an hourly wage of $6.87 ($333.88/48.61 hours). The applicable minimum wage is $7.25 per hour. 29 U.S.C. § 206.

[8] Although Montoya asserted several claims against CRST, only his claim challenging CRST's compensation for sleeper berth time is at issue in this appeal. The district court granted Montoya's motion for certification of a collective action on that claim pursuant to 29 U.S.C. § 216(b). See Montoya v. CRST Expedited, Inc., 311 F. Supp. 3d 411, 419-27 (D. Mass. 2018). The district court defined the class as "all individuals who have participated as contract drivers in any phase of CRST's Driver Training Program, at any time since December 22, 2013." Id. at 414-22.

that drivers' sleeper berth time exceeding eight hours is compensable under the FLSA.  Montoya v. CRST Expedited, Inc., 404 F. Supp. 3d 364, 393-95 (D. Mass. 2019).  Thus, the court concluded, the additional sleeper berth time must be included when calculating whether CRST pays its drivers an hourly wage that meets the minimum wage requirements under the FLSA.  See id.  CRST appealed the summary judgment for Montoya.[9]

## II.

We review the district court's grant of summary judgment de novo.  Giguere v. Port Res. Inc., 927 F.3d 43, 47 (1st Cir. 2019).  Summary judgment is proper when there is "no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The parties do not dispute any of the facts pertinent to the sleeper berth claim as laid out above.  Rather, they disagree as to whether sleeper berth time exceeding eight hours per day is compensable work under the FLSA.

---

[9] CRST filed a notice of appeal after the district court issued a separate and final judgment on the sleeper berth claim and subsequently filed a second notice of appeal after the court entered final judgment on the remaining claims.  While there was some initial dispute about the timeliness of CRST's notices of appeal, we allowed the matter to proceed and granted the parties' joint motion to consolidate the two notices of appeal, thereby resolving the timeliness question.  As noted, CRST has appealed only from the district court's summary judgment for Montoya on the sleeper berth claim.

**A. Compensable Work Under the FLSA**

    **1. The Legal Framework**

The FLSA currently requires employers to compensate employees for each hour of work at a rate of at least $7.25 an hour. 29 U.S.C. § 206(a). Although Congress has never defined what constitutes "work" under the FLSA, the Supreme Court, in dealing with FLSA cases, has described work as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944). In subsequent cases, the Supreme Court has clarified that this "exertion" can be negligible, as "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944). In cases involving waiting, the critical question is whether an employee is "engaged to wait" (which is generally compensable) or "wait[ing] to be engaged" (which is noncompensable). Skidmore v. Swift & Co., 323 U.S. 134, 137 (1944). To answer this question and thereby determine whether an employee's time is compensable under the FLSA, we apply what other circuits have dubbed the "predominant benefit test": employee time is compensable work when this "time is spent predominantly for the employer's benefit," which "is a question

- 11 -

dependent upon all the circumstances of the case." Armour, 323 U.S. at 133; Singh v. City of New York, 524 F.3d 361, 367-69 (2d Cir. 2008) (applying the "predominant-benefit test"); Roy v. County of Lexington. 141 F.3d 533, 544-45 (4th Cir. 1998) (same).

Circuit courts have applied the predominant benefit test to determine whether employee time is compensable work in a variety of circumstances, including on-call time, mealtime, and commuting time.[10] In so doing, they have identified useful factors to guide our analysis of whether "time is spent

---

[10] We note that the parties have not identified, nor have we found, any published circuit court decisions addressing whether sleeper berth time constitutes compensable work for the purposes of the FLSA. Indeed, the Ninth Circuit appears to be the sole federal appellate court that has contemplated this question, but the resulting unpublished opinion concludes in a single sentence that sleeper berth time is non-compensable, with little analysis of the applicable legal standard or the circumstances of the case. See Nance v. May Trucking Co., 685 Fed. App'x 602, 605 (9th Cir. 2017) ("Reviewing de novo, . . . we affirm because the district court properly relied on the persuasive authority of federal and state regulations saying drivers are not entitled to compensation for time they are permitted to sleep in the berths of moving trucks.").

In a similar vein, we note that some district courts have addressed whether sleeper berth time is compensable under the FLSA. See, e.g., Roberts v. TransAm Trucking, Inc., 2023 WL 6376756 (D. Kan. Sept. 29, 2023); Haworth v. New Prime, Inc., 448 F. Supp. 3d 1060 (W.D. Mo. 2020); Julian v. Swift Transp. Co. Inc., 360 F. Supp. 3d 932 (D. Ariz. 2018); Browne v. P.A.M. Transp., Inc., No. 5:16-CV-5366, 2018 WL 5118449 (W.D. Ark. Oct. 19, 2018). These decisions have addressed the issue under differing procedural postures -- for example, in the context of class certification -- and have reached varying conclusions. Accordingly, we focus our analysis on the treatment of analogous issues by circuit courts.

predominantly for the employer's benefit." Armour, 323 U.S. at 133. Physical location is one such factor. Although we have not previously engaged with the predominant benefit test, we have recognized the "FLSA's usual rule . . . that an employer must pay an employee for all time the employee is required to spend at a worksite."[11] Giguere, 927 F.3d at 47. Other courts have incorporated this "usual rule" into their application of the predominant benefit test in on-call cases, determining that the employee's physical location and ability to leave that location are important factors to consider when applying the test. See, e.g., Rapp v. Network of Cmty. Options, Inc., 3 F.4th 1084, 1087 (8th Cir. 2021) (explaining that factors "[t]o determine whether on-duty waiting or sleeping time is working time" include "whether [the employee] is required to remain on or about the premises during such time"); Rutlin v. Prime Succession, Inc., 220 F.3d 737, 744 (6th Cir. 2000) (determining that an employee was working even though he was at home for the

---

[11] In Giguere, we determined that an organization running group homes for adults with developmental disabilities violated the FLSA when it did not compensate residential employees for overnight time spent on the employer's premises, a question that turned on the DOL's guidance outlining the parameters of the "workweek" for employees who "reside[] on the employer's premises." Giguere, 927 F.3d at 47-48. While we did not apply the predominant benefit test in that situation, our recognition of the FLSA's foundational rule (that an employer must pay an employee for all time the employee is required to spend at a worksite) is pertinent here.

on-call period, in part because he had to take landline phone calls and thus could not leave home).

The employee's ability to leave the workplace has also proved an important factor in mealtime cases. For instance, the Fourth Circuit -- applying the predominate benefit test -- found that medical employees' mealtimes were not for the employer's predominant benefit, and therefore not compensable work, when the employee could leave the workplace for the meal and was not interrupted during that time. See Roy, 141 F.3d at 544-46.

An employee's ability to engage in personal activities during the contested time also informs whether the time is predominantly for the employer's benefit. The employee's ability to use his time for recreational purposes may suggest that he is waiting to be engaged, but this determination depends on the degree of freedom with which the employee can pursue leisure activities and whether he can spend time "in the ways the [employee] would have chosen had [he] been free to do so." Skidmore, 323 U.S. at 139. Hence, the Supreme Court found in Armour that firefighters who were required to spend on-call time in the fire hall, where they had to respond to alarms and perform minor maintenance work but could otherwise engage in recreational activities such as playing cards and listening to the radio, were engaged in compensable work under the FLSA because their waiting time was for the employer's benefit.

- 14 -

Armour, 323 U.S. at 132-34. Conversely, the Eleventh Circuit determined that on-call police officers who could remain at home or travel so long as they had a beeper were not entitled to compensation, as the employees "could do anything they normally did so long as they were able to respond to a call promptly" and the time was therefore "not used predominantly for the employer's benefit." Birdwell v. City of Gadsden, 970 F.2d 802, 808-10 (11th Cir. 1992).

Courts also assess the burden on the employee when determining whether employee time is for the employer's benefit. Applying the predominant benefit test in the context of commuting, the Second Circuit determined that an employee's commute was not compensable work because the only work-related activity that the employee had to perform during the commute was to carry a briefcase of materials with him. See Singh, 524 F.3d at 368-69. The additional time and effort that this activity required of the employee presented such a "minimal burden" that the court concluded "the [employer] is [not] the predominant beneficiary of this time." Id.

The DOL's own regulations interpreting the FLSA build on the standards for compensable work outlined in the above jurisprudence. Citing Skidmore, the DOL explains that an employee between assignments who "is unable to use the time effectively for his own purposes" is working, because the time

- 15 -

"belongs to and is controlled by the employer" and thus the employee is "engaged to wait." 29 C.F.R. § 785.15 (citing Skidmore, 323 U.S. at 137). An employee who is "completely relieved from duty," however, is not working. 29 C.F.R. § 785.16. With respect to truck drivers, the DOL explains that a driver is relieved from duty when, for example, he has a six-hour layover between delivering goods and waiting for his next shipment to be loaded, provided he can leave the worksite and does not have to take care of the truck during this time. See id. (citing Skidmore, 323 U.S. at 137).

### 2. Sleeper Berth Time

We turn to the application of this "predominant benefit test" to the sleeper berth time in the present case. CRST argues that none of the time that team drivers spend in the sleeper berth should be considered work under the FLSA because the drivers are "waiting to be engaged" during that time and thus their time is their own. In urging us to reach this conclusion, CRST observes that drivers can sleep, fix meals, watch television, and access the internet while in the sleeper berth. Further, CRST contends that because the driving teammate is responsible for all work-related duties while the non-driving teammate rests, and because CRST employs its drivers to drive, not to rest, the sleeper berth time is primarily for the employee's benefit. Finally, CRST argues that the

- 16 -

classification of the sleeper berth time as off-duty time by the DOT regulations renders it non-compensable under the FLSA.

Montoya, on the other hand, claims that drivers' confinement to the restrictive environment of the sleeper berth means that such time predominantly benefits the employer, and thus is compensable work. Moreover, he underscores that CRST's team-driving business model relies on, and profits substantially from, drivers continuing to travel while taking their rest period, rendering this time for the employer's benefit.

To assess these competing claims, we turn first to CRST's regulatory argument. It is true, as CRST asserts, that the DOT's Hours of Service regulations require drivers to be "relieved from work and all responsibility for performing work" during the ten-hour "off-duty" period and specifically exclude "time spent resting in a sleeper berth" from "[o]n-duty time." 49 C.F.R. § 395.2. CRST's reliance on the DOT regulations to determine what constitutes compensable work is misplaced, however. The DOT regulations concern driver and road safety and, unlike the FLSA, do not address worker compensation. Compare Hours of Service of Drivers, 65 Fed. Reg. 25540, 25540 (proposed May 2, 2000) (noting that the Hours of Service regulations concern drivers' resting time to "reduce the risk of drivers operating commercial motor vehicles (CMVs) while drowsy, tired, or fatigued [and] to reduce crashes involving these

drivers") with 29 U.S.C. § 206 (establishing the minimum wage). The DOT's road safety regulations are thus of little help in determining what constitutes compensable working time under the FLSA.

Indeed, the DOT itself has recognized that using DOT classifications of "off-duty" time to guide issues of compensability is misplaced and can result in employers circumventing the FLSA's requirements. See Hours of Service of Drivers, 65 Fed. Reg. at 25564-65 (noting that "motor carriers generally have relied upon the [DOT regulations] under 49 CFR part 395 . . . to calculate the minimum wage required to be paid to the driver for each workweek. . . . [S]ome motor carriers that have not understood the difference [between DOT and DOL regulations] may miscalculate the minimum wage, placing the motor carrier in violation of the FLSA.").[12] We thus reject CRST's invitation to interpret the FLSA using the DOT regulations and turn to the application of the predominant benefit test.

First, the drivers' confinement to the restricted environment of their workplace suggests that such time is for CRST's benefit. As the parties acknowledge, drivers spend the

_____

[12] The DOL regulations in question, which we turn to below, were promulgated pursuant to the FLSA and provide guidance on employee compensation. See 29 C.F.R. § 785.1 (noting that the DOL regulations outline "the principles involved in determining what constitutes working time" under the FLSA).

- 18 -

vast majority of their time not spent driving in the sleeper berth of a moving truck. They remain at their place of work, with their freedom of movement severely curtailed, throughout the sleeper berth time, regularly spending ten, twelve, and even sixteen hours in the confines of this small space. The drivers can leave the workplace only when the truck stops, distinguishing this case from many of the contexts that other circuits have considered. See, e.g., Birdwell, 970 F.2d at 808-10 (emphasizing that employees were free to leave the worksite to engage in personal pursuits during the time at issue); Rapp, 3 F.4th at 1087 (same); Roy, 141 F.3d at 545-46 (same).

Although CRST recognizes that employees are confined to the sleeper berth, it repeatedly emphasizes that the drivers may use the sleeper berth time for personal activities such as eating, watching movies, and connecting to the internet, making such time predominantly for the drivers' benefit. Somewhat implausibly, CRST contends that drivers can do "anything . . . they [have] a mind to do" during their sleeper berth time.

CRST's argument turns a blind eye to the limitations inherent in the drivers' physical location. Though drivers may be able to engage in some leisure activities, the nature of these activities is restricted by the drivers' presence in the sleeper berth of a moving truck -- a small space, containing only some basic living essentials, that drivers cannot leave

until the truck stops moving. The minimum height of the sleeper berth is a mere 24 inches as measured from the top of the mattress installed in the berth, see 49 C.F.R. § 393.76(a)(1), meaning that drivers may struggle to stand or even sit up in bed in the sleeper berth. The driver in the sleeper berth is also in constant proximity to the noise of the truck's engine, further reducing drivers' ability to sleep, relax, or engage in leisure activities of their choice. In short, CRST's argument that the drivers' time is their own because they can use it as they wish is unpersuasive considering the drivers' physical confinement in a restrictive space that is ill-equipped for many activities.

Moreover, CRST's argument overlooks the Supreme Court's jurisprudence establishing that the ability to engage in some leisure activities does not, in and of itself, render an employee's time for the employee's own benefit. In Armour, the Court found that the employee firefighters' time benefited the employer and was compensable work even though they could play cards, listen to the radio, or eat while waiting for the next alarm. Armour, 323 U.S. at 132-34. As the Court explained, the time did not become the employee's own "merely because the nature of the duty left time hanging heavy on the employees' hands and because the employer and employee cooperated in trying to make the confinement and idleness incident to it more

- 20 -

tolerable." Id. at 134. Similarly, here, the drivers' time is not their own merely because they can pass the time spent in the sleeper-berth by watching a movie or surfing the internet, activities that are the modern-day equivalents of cards and the radio.

The fact that the drivers are typically traveling during time spent in the sleeper berth also suggests that such time is for CRST's benefit, given the importance of continuous travel to CRST's business. CRST's team driving approach, requiring drivers to trade on and off their driving and non-driving times until they arrive at their destination, allows CRST's trucks to remain in near continuous motion while complying with DOT regulations limiting drivers' hours behind the wheel. CRST benefits enormously from the team driving model as the company makes its deliveries in approximately half the time that it would take a solo driver to complete the same trip. Indeed, CRST understands the necessity of drivers' sleeper berth time to the company's bottom line, explaining that its team driving model allows it to "get twice the utilization out of the truck and keep that cargo moving . . . twenty hours a day or more." Such speed of travel is made possible only by the resting driver resetting their driving hours in the sleeper berth while their teammate continues to drive.

Finally, we consider whether time spent in the sleeper berth burdens the driver confined therein. While the record does not contain examples of drivers' sleeper berth time being interrupted for work, the nature of the team driving setup means that the driving teammate may call on the resting teammate to provide emergency assistance, even during the mandated ten-hour period defined as "off-duty" by the DOT regulations. See 49 C.F.R. § 395.1(b)(2) (providing that, in "emergency conditions," a driver may complete the shipment even if the driving time falls outside of the maximum driving time "without being in violation of the provisions of the regulations"). The discomfort of being confined in a small and noisy space, as well as the possibility of interruptions, suggest that the sleeper berth time presents more than a "minimal burden" on drivers. See Singh, 524 F.3d at 368. Considering the restrictions that sleeper berth time places on drivers and its centrality to CRST's team driving model, we conclude that such time predominantly benefits the employer.

**B. The DOL Regulations**

As a general matter, time that predominantly benefits the employer is compensable work under the FLSA, absent an exception to compensability provided for in the statute or DOL regulations. See Tenn. Coal, Iron & R.R. Co., 321 U.S. at 602 (stating that the FLSA "guarantee[s] compensation" for all hours

worked); Armour, 323 U.S. at 134 (stating that the act provides for some "exclu[sions]" from working time).[13] We therefore turn to the application of the DOL regulations to this dispute. At the heart of the parties' dispute are two regulations governing sleep time: 29 C.F.R. § 785.22 and 29 C.F.R. § 785.41. Section 785.22(a) reads, in pertinent part:

> Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked . . . . If [the] sleeping period is of more than 8 hours, only 8 hours will be credited.

Section 785.41 reads:

> Any work which an employee is required to perform while traveling must, of course, be

___

[13] In applying the predominant benefit test and upholding the general principle that employers must pay employees for hours worked, circuit courts have recognized that both statutory and regulatory provisions identify some exceptions to compensability for otherwise compensable work. See, e.g., Birdwell, 970 F.2d at 804 (explaining that, "[i]n general, employers are required to pay employees . . . for hours worked" but recognizing that, in the case of some overtime hours, the FLSA provides "an exception to this rule" depending on a number of factors enumerated in the statute); Gelber, 14 F.4th at 1280-86 (noting that the predominant benefit test "governs the general question [of] whether time spent is compensable work," but recognizing that the DOL regulations provide that an employer may "deduct meal breaks" from an employee's "otherwise compensable" time in certain circumstances); Singh, 524 F.3d at 367-68 (explaining that "whether an employee's expenditure of time is considered work under the FLSA turns in part on whether that time is spent predominantly for the benefit of the employer," but recognizing that some statutory and regulatory provisions "exempt[] employers from compensating employees" for certain activities).

- 23 -

counted as hours worked. An employee who drives a truck . . . or an employee who is required to ride therein as an assistant or helper, is working while riding, except . . . when he is permitted to sleep in adequate facilities furnished by the employer.

Montoya does not dispute that CRST can deduct an eight-hour sleeping period from drivers' compensable hours, nor does he challenge the adequacy of the sleeping facilities. The sole dispute between the parties is whether, under these regulations, CRST can deduct time drivers spend in the sleeper berth beyond the eight-hour exception set forth in § 785.22 from drivers' compensable work.

CRST argues that § 785.41 is the only applicable regulation. In urging us to ignore § 785.22 entirely, CRST argues that employees are not "on duty for 24 hours or more" because they are not working during the time spent in the sleeper berth and, per DOT regulations, drivers are only "on duty" for shifts of 14 hours or less. CRST therefore contends that § 785.41 alone applies, and the plain text of the regulation compels us to conclude that employers can deduct any amount of time that an employee is confined to the sleeper berth from compensable hours, because the employee is "permitted to sleep in adequate facilities" during such time.

Montoya counters that both sections 785.22 and 785.41 apply because drivers are working when they are in the sleeper

berth and are therefore "on duty" for twenty-four hours or more, as that concept is defined by DOL regulations that, unlike the DOT regulations, construe the FLSA. See 29 C.F.R. § 785.15 (an employee is "engaged to wait" and thus "[o]n duty" when he is "unable to use [his] time effectively for his own purposes," because it "belongs to and is controlled by the employer"). Reading sections 785.22 and 785.41 together, Montoya argues that CRST can deduct a period of sleep time from drivers' compensable hours, but that this sleeping period can be no more than eight hours. Thus, Montoya argues, CRST must compensate drivers for all sleeper berth time extending beyond the eight-hour sleeping period.

## 1. The Legal Framework for Applying the Regulations

We review administrative regulations in the broader context of the statutory and regulatory scheme. See, e.g., Anversa v. Partners Healthcare Sys., Inc., 835 F.3d 167, 169-72 (1st Cir. 2016) (outlining in detail the relevant statutory and regulatory scheme to contextualize the regulation at issue); Charles H. Koch, Jr. & Richard Murphy, 3 Admin. L. & Prac. § 10:51 (3d ed., 2023) (noting that courts should review regulations in context). In so doing, we "construe a regulation in light of the congressional objectives of its underlying statute." United States v. Lachman, 387 F.3d 42, 52 (1st Cir. 2004). It is well established that the underlying statute here,

the FLSA, was designed to protect workers' living standards and health by guaranteeing adequate compensation, and the DOL's regulations provide guidance to employers in upholding the protections of the FLSA. See 29 U.S.C. § 202(a) (noting that Congress sought to guard against "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers"); 29 C.F.R. § 785.1 (noting that the regulations outline "the principles involved in determining what constitutes working time" under the FLSA).

When reading the regulations against this statutory background, we do not give force to one phrase in isolation. See Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 321 (2014) (noting that reading a provision in context may produce a different meaning than reading a provision in isolation); Jette v. United of Omaha Life Ins. Co., 18 F.4th 18, 28 (1st Cir. 2021) (explaining that we "construe the regulation in light of its chosen 'language . . . , the specific context in which that language is used, and the broader context of the [regulation] as a whole'" (quoting In re Fin. Oversight & Mgmt. Bd. for P.R., 919 F.3d 121, 128 (1st Cir. 2019))). Rather, we must read a body of regulations in harmony, avoiding conflict between provisions and "giving effect, when possible, to all

provisions."  McCuin v. Sec'y of Health & Hum. Servs., 817 F.2d 161, 168 (1st Cir. 1987).

## 2. Application of the Regulations

We first consider whether § 785.22 applies to the facts before us.  Section 785.22 deals with sleeping time and specifies that when employees are "required to be on duty for 24 hours or more, the employer may exclude a sleeping period of not more than eight hours."  We understand CRST to argue that § 785.22 does not apply to its drivers because they are not "on duty for 24 hours or more."  CRST contends that its drivers work for only fourteen hours at a time because that is the maximum number of hours that the DOT's regulations permit a driver to be "on duty," as the term is used in the DOT regulations, before taking a rest period in the sleeper berth, which CRST argues is not compensable work.  However, our predominant benefit test analysis necessarily informs our application of § 785.22.  As we have explained in Part II.A, the sleeper berth time is for the benefit of the employer and therefore constitutes 'on duty' time, as that term is set forth in 29 C.F.R. § 785.15 and used in 29 C.F.R. § 785.22.  Since CRST's drivers are "on duty," for purposes of the FLSA, when in the sleeper berth, and may spend more than 24 consecutive hours either in the sleeper berth or driving and performing other work tasks, team drivers are "on

duty" for periods of twenty-four hours or more.  Section 785.22 thus applies.

The question then becomes how we read § 785.22 with § 785.41, given the statutory and regulatory context and the facts before us.  Section 785.41 deals with travel time and specifies that employees who perform work while driving or riding in a truck are "working while riding, except . . . when [they are] permitted to sleep in adequate facilities furnished by the employer."  CRST's argument would have us read into § 785.41 an exception to the sleeping-time cap of § 785.22 for employees who work while traveling, but it fails to offer a rationale to explain why the DOL would have created such an exception.  Rather, the better reading of the regulations is that they work together: § 785.41 provides that employees who work while traveling in a truck are "working while riding" except during a sleeping period.  Section 785.22 provides that such a sleeping period is non-compensable, but only for a maximum of eight hours.[14]  This reading gives effect to the language of both regulatory provisions and is consistent with the overarching statutory and regulatory framework protecting employees from exploitative compensatory practices.  See 29

_____

[14] It is immaterial whether the remaining sleeper berth time is part of the drivers' DOT-required ten-hour "off-duty" period. As explained above, all such time is compensable work under the FLSA and the DOT definitions of time do not affect compensability.

U.S.C. § 202(a); <u>Giguere</u>, 927 F.3d at 50 (acknowledging the FLSA's remedial purposes and protective policy objectives).

CRST's reading of § 785.41, which forecloses compensation for any hours that the driver spends in the sleeper berth, contradicts these protective principles. Taken to its logical conclusion, CRST's reading of § 785.41 would permit employers to avoid compensating drivers by confining them to the sleeper berth for an unlimited number of hours simply because that is time in which they are "permitted to sleep," even though -- as CRST acknowledged in a deposition -- it is unreasonable to propose that a driver would be sleeping for the ten or more hours per day spent in the sleeper berth.[15]

Moreover, CRST's reading of § 785.41 would have us reject the predominant-benefit test that Supreme Court precedents require us to apply. See <u>Armour</u>, 323 U.S. at 133 (explaining that "time [that] is spent predominantly for the employer's benefit" is working time); 29 U.S.C. § 206(a) (guaranteeing compensation for working time)."

For a similar reason, CRST's argument that § 785.41 is a specific regulatory provision that trumps the more general

---

[15] Charles Haffenden, a former CRST vice president, recognized in a July 2017 deposition that it would be hard for a person to spend more than ten hours per day sleeping, saying: "I find it personally hard to sleep more than about seven hours at a stretch. . . . I don't know anybody that could spend ten hours in there [sleeping] continuously."

provision of § 785.22 is unpersuasive. CRST is correct that when a specific provision of a regulation conflicts with a general one, the specific provision ordinarily governs. See Tasker v. DHL Ret. Sav. Plan, 621 F.3d 34, 43 (1st Cir. 2010); cf. Edmond v. United States, 520 U.S. 651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."). But here, even if we were to characterize the regulations in the way CRST argues,[16] the two provisions are not in conflict with one another. Indeed, they must be read harmoniously to avoid direct contradiction with each other and with the outcome of our application of the predominant benefit test. Since the caselaw informs our understanding of the regulations -- notably, as we have explained, our understanding of whether the drivers are "on duty for 24 hours or more" for the purposes of § 785.22(a) -- we cannot adopt a reading of the regulations that is irreconcilable with the background law.

### 3. Wage and Hour Division Opinion Letters

As a final matter, we address opinion letters from the DOL's Wage and Hour Division ("WHD") that both parties invoke to

---

[16] CRST argues that § 785.22 is a general provision governing sleep time and § 785.41 is a "truck-driving specific" provision. In response, Montoya argues that § 785.41 is no more specific than § 785.22, as the two provisions address different issues -- § 785.22 concerns compensation for sleep and meal periods, and § 785.41 concerns compensation for all employees who work while traveling.

support their differing interpretations of the regulations. To the extent that CRST asks us to defer to one such letter from 2019 -- which, as discussed below, rescinded earlier letters and opined that sleeper berth time is non-compensable, but which the agency states no longer represents the agency's views -- we may do so only to the extent that the letter is persuasive based on the factors outlined by the Supreme Court in Skidmore, 323 U.S. at 140. The "mix of factors" we consider to gauge persuasiveness includes "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and the] consistency [of its interpretation] with earlier and later pronouncements." Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 55 (1st Cir. 2014) (alterations in original) (quoting Doe v. Leavitt, 552 F.3d 75, 81 (1st Cir. 2009)). The validity of the agency's reasoning is the "most salient . . . factor[]" in gauging persuasiveness. Id. (quoting Doe, 552 F.3d at 82).

Since the 1960s, the WHD has published at least five opinion letters clarifying that the DOL regulations require employers to compensate employees for sleeper berth time exceeding eight hours. See U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA-213 (Jan. 6, 1964); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA-214 (Feb. 17, 1964); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA-235 (Nov. 18, 1966); U.S. Dep't of Labor, Wage & Hour Div.,

Opinion Letter SCA-117 (Apr. 26, 1978); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter SCA-118 (June 22, 1979). These letters, and the Secretary of Labor's briefing in this litigation, explicitly state that § 785.22 and § 785.41 are consistent with one another, "must be read together," and that, therefore, "a maximum of 8 hours per day of sleeper berth time is excludable from hours worked for on-duty periods of 24 hours or more."

In support of its position that we should look only to § 785.41, CRST asks us to defer instead to one short-lived 2019 opinion letter. In that one letter, the WHD rescinded its five prior letters and adopted the new position that, under § 785.41, "the time drivers are relieved of all duties and permitted to sleep in a sleeper berth is presumptively non-working time that is not compensable" because the prior interpretation was "unnecessarily burdensome for employers." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2019-10 at 3 (Jul. 22, 2019). The WHD then withdrew the 2019 letter on February 19, 2021, explaining that it was "inconsistent with longstanding WHD interpretations regarding the compensability of time spent in a truck's sleeper berth." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter Search (FLSA2019-10), available at https://www.dol.gov/agencies/whd/opinion-letters/search (last

visited Sep. 14, 2023).  The WHD also reinstated the previously withdrawn opinion letters.  See id.

In arguing for deference to the 2019 opinion letter, CRST claims that it accurately represents the DOL's pre-1960s guidance on the compensability of sleeper berth time and thus returns the DOL's interpretation of the regulations to its original meaning.  In support of this argument, CRST points to a 1943 WHD press release stating that "[t]ruck drivers riding in the trucks' sleeping berths while the relief driver is at the wheel need not be compensated," U.S. Dep't of Labor, Press Release R-1933, Hours Worked in Trucking Clarified (Feb. 15, 1943), along with a statement in the WHD's 1948 Field Operations Handbook that "time actually spent in the sleeping berths" should not be considered "hours worked,"  U.S. Dep't of Labor, Field Operations Handbook, Hours Worked, Part 130.41 (1948 ed., rev. 1949).

We agree, however, with Montoya and his amici -- including the Secretary of Labor -- that the 2019 opinion letter is not entitled to deference.  That is so for two primary reasons.  First, the letter provides little justification for its significant departure from the WHD's position of almost sixty years.  Simply stating without more that the WHD's prior position was "unnecessarily burdensome for employers" does not evince thoroughness or considered reasoning, especially

- 33 -

considering the policy rationales underscoring the FLSA that seek to protect employees.

We find similarly unsatisfactory the letter's conclusory assertion that "WHD disagrees with recent judicial decisions that have regarded sleeper berth time as on-duty sleeping time, rather than off-duty travel time," a remark unadorned by any analysis of the reasoning in those cases or any explanation for the disagreement. Likewise, the letter provides no basis for its assertion that it "understands [its interpretation] to reflect the prevailing practice in the trucking industry," nor does it cite any legal authority explaining why that would be a relevant consideration. And the letter simply declares that the regulatory scheme marks a "clear distinction between [compensable] on-duty sleep time . . . and [non-compensable] non-working time when the employer permits the employee to sleep" without considering whether §§ 785.22 and 785.41 should be read in conjunction, as previous opinion letters had done, or explaining its refusal to do so.

It is of little import that, as CRST contends, the 2019 letter may reflect WHD guidance on the compensability of sleeper berth time contained decades ago in pre-1960s WHD statements, such as the 1943 press release and 1948 handbook. The DOL regulations at issue here were adopted in 1955, including the regulations addressing the eight-hour cap on non-

compensable sleeping time, and the adoption of the regulations explicitly superseded prior opinions put forth by WHD. See U.S. Dep't of Labor, Wage & Hour Div. Interpretive Bulletin Part 785, 20 Fed. Reg. 9963 (Dec. 24, 1955); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA-214 (Feb. 17, 1964) (explaining that WHD statements predating the DOL regulations had been superseded by subsequent guidance).[17] Without further reasoning, the 2019 letter does not support deference to its opinion.

Second, the 2019 letter adopts a position that is irreconcilable with the previous five WHD letters addressing this issue. The pre-2019 letters maintain the consistent position that the maximum number of hours that an employer can deduct for time spent in the sleeper berth of a truck is eight hours, and they offer reasoned justification for WHD's position. For example, the pre-2019 letters explicitly address the interaction of the regulations on sleeping time with the regulations on travel. The 1978 letter explains that §§ 785.22 and 785.41 "must be read in conjunction and not as separate positions regarding sleeping time. As section 785.22 makes

---

[17] The regulations promulgated in 1955 at 29 C.F.R. Part 785 codified and expanded upon earlier guidance. The eight-hour cap was initially contained in § 785.3(e)(2) and later moved to § 785.22, where it remains. See U.S. Dep't of Labor, Wage & Hour Div., Interpretive Bulletin Part 785, 20 Fed. Reg. 9963, 9965 (Dec. 24, 1955); U.S. Dep't of Labor, Wage & Hour Div., Revised Interpretive Bulletin Part 785, 26 Fed. Reg. 190, 193 (Jan. 11, 1961).

clear, the maximum amount of time for sleeping that can be deducted from working time where employees are on 24-hour duty is 8 hours." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter SCA-117 (Apr. 26, 1978). In the same vein, the 1979 letter outlines the development of Supreme Court caselaw on the compensability of waiting time to contextualize the regulations, before reiterating that "it has long been our position that section 785.41 must be read in conjunction with section[] . . . [785].22" and stating that "section 785.41 does not alter the general rules on sleep time." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter SCA-118 (June 22, 1979).[18]

These pre-2019 letters are consistent internally -- they represent more than five decades of the same policy -- and consistent with the purpose of the statutory and regulatory scheme, unlike the irreconcilable and unreasoned 2019 letter.

---

[18] The 1979 opinion letter also endorses the view, not addressed by the parties, that in an on-duty period extending beyond 24 hours, employers may exclude a maximum of one additional hour of sleep time for each hour on duty beyond 40 hours, such that a driver must have been on duty for 48 hours for an employer to deduct sixteen total sleeping hours from compensation (and, presumably, applying the same pattern for each subsequent 24-hour period). As we explain, we agree with the Department of Labor's underlying premise that a driver's sleeper berth time is compensable "on-duty" time, and we do not pass on here the Department's assessment of how to calculate additional periods of excludable sleep time beyond the initial 24-hour period.

As such, the pre-2019 letters are entitled to respect.[19]  We therefore read § 785.22 with § 785.41 to conclude that the eight-hour cap applies to time spent riding in the sleeper berth.

**III.**

Based on our application of the predominant benefit test and the DOL regulations at issue, we hold that employees' time spent in the sleeper berth that exceeds eight hours per day is compensable work under the FLSA.  We therefore affirm the district court's grant of summary judgment for Montoya on this issue.

So ordered.

---

[19]  We also acknowledge that the Secretary of Labor's briefing in this litigation, advocating for the compensability of sleeper berth time exceeding eight hours, is consistent with the DOL regulations and the WHD's longstanding position.